1              UNITED STATES DISTRICT COURT

             NORTHERN DIVISION OF GEORGIA

2                GAINESVILLE DIVISION

3

4    CINDY COSPER,           )

                             )

5         Plaintiff,         )

                             )Civil Action No.

6    vs.                     )

                             )2:18-cv-00189-CWS

7    FORD MOTOR COMPANY,     )

                             )

8         Defendant.         )

9

10

11                    DEPOSITION OF

12                 TROOPER JOEY WILSON

13              Tuesday, October 29, 2019

14                     10:10 a.m.

15                    Peachtree Club

16              999 Peachtree Street, N.E.

17                      Suite 28

18                  Atlanta, Georgia

19

20         Robin K. Ferrill, CCR-B-1936, RPR

21

22

23

24

25      Job No. CS3577058

```
1                    APPEARANCES OF COUNSEL
2    On behalf of the Plaintiff
     JONATHAN A. PARRISH, Esquire
3         The Parrish Law Firm, LLC
          Resurgens Plaza, Suite 2250
4         945 East Paces Ferry Road, N.E.
          Atlanta, Georgia  30326-2900
5         404.891.0141
          jparrish@parrishfirm.com
6
7
8    On behalf of the Defendant
     MICHAEL R. BOORMAN, Esquire
9    DWAYNE ALLYN BROWN, Esquire
     KARISSA BLACKBURN, Paralegal
10        Huff Powell Bailey LLC
          999 Peachtree Street, N.E., Suite 950
11        Atlanta, Georgia  30309-4514
          404.892.4022
12        mboorman@huffpowellbailey.com
          dbrown@huffpowellbailey.com
13
14
15   On behalf of the Defendant
     DAMON SINGLETON, Esquire (via phone)
16        Turner and Associates, P.A.
          4705 Somers Avenue
17        Suite 100
          North Little Rock, Arkansas   72116
18        damon@tturner.com
19
20
21
22
23
24
25
```

```
 1                        INDEX

 2                   DEPOSITION OF

 3               TROOPER JOEY WILSON

 4            Tuesday, October 29, 2019

 5    EXAMINATION BY                      PAGE

 6    Mr. Boorman                         4, 96

 7    By Mr. Parrish                        79

 8


                 DESCRIPTION OF EXHIBITS

 9

      DEFENDANT'S EXHIBIT  IDENTIFICATION      PAGE

10    Exhibit 1   Subpoena to Testify           6

11    Exhibit 2   Georgia Motor Vehicle Crash Report    7

12    Exhibit 3   Georgia Motor Vehicle Crash Report    7

13                Overlay, Cindy Cosper

14    Exhibit 4   Georgia Motor Vehicle Crash Report    7

15                Overlay, Ronnie Ammerson

16    Exhibit 5   Georgia Uniform Traffic Citations,   10

17                Summons and Accusation

18    Exhibit 6   Color copies of photographs         12

19    Exhibit 7   *Copy of in-car video               15

20    Exhibit 8   State of Georgia Traffic Crash      15

21                Report

22    Exhibit 9   Ga. Code Ann., 40-8-74, Effective   78

23                July 1, 2011

24         (Original exhibits attached to the Original

25      transcript.)
```

1           DEPOSITION OF

2         TROOPER JOEY WILSON

3       Tuesday, October 29, 2019

4           MR. BOORMAN:  Ready to go on the record.

5       This will be the deposition of Trooper Wilson

6       taken by agreement of counsel and pursuant to

7       the Federal rules.  And if you could please

8       swear the witness.

9    TROOPER JOEY WILSON,

10          called as a witness, having been duly sworn

11   by a Notary Public, was examined and testified as

12   follows:

13          MR. PARRISH:  We reserve any objections

14       except those going to the form of the question,

15       responsiveness of the answer until the

16       deposition is first used.

17          MR. BOORMAN:  That is fine with me.  I

18       think that's what the Rules say as well.

19          MR. PARRISH:  Okay.  I just wanted to

20       confirm.

21          MR. BOORMAN:  Sure.

22   EXAMINATION

23   BY MR. BOORMAN:

24       Q.  Trooper Wilson, if you can state your full

25   name for the record.

1        A.   Joseph Edwin Wilson.

2        Q.   **Okay.  And have you given a deposition**

3   **before?**

4        A.   Previously of this case?

5        Q.   **No, sir.  Just --**

6        A.   Yes.

7        Q.   **Just in general.**

8        A.   Yes.

9        Q.   **How many depositions have you given?**

10       A.   Maybe two.

11       Q.   **Okay.  So the things that I want you to**

12  **remember are if you need a break at any point for any**

13  **reason, you need to get a call, you need to get a**

14  **drink of water, anything, just let me know and we're**

15  **happy to take a break.  Okay?**

16            **The other thing that I ask is if any of my**

17  **questions are confusing or you don't understand them,**

18  **just let me know and I'm always happy to rephrase.**

19  **And I'm pretty sure that's true for Mr. Parrish as**

20  **well.  Okay?**

21       A.   Okay.

22       Q.   **All right.  Then as we get going in**

23  **conversation, sometimes people get used to nodding**

24  **their head or shaking their head.  I don't mean to be**

25  **rude but I'll just ask if you could say, you know, an**

1      audible answer.  But as you see, we've got a very

2      talented court reporter taking down every word that

3      we say but she can't really take down what nods and

4      shakes are.

5              Is that okay?

6          A.   It is.

7          Q.   All right.  Thank you.

8              Then I'll tell you the way I like to just

9      kind of methodically go through this.  I want to talk

10     to you about file materials that you either have or

11     know exist.  Then we'll talk about your background

12     for a little bit.  Then we'll talk about what you

13     know about this crash and your investigation.

14              Okay?

15         A.   Okay.

16              (Defendant's Exhibit 1, Subpoena to

17          Testify, marked for identification.)

18         Q.   (By Mr. Boorman) So first I've marked as

19     Exhibit 1 just the Notice of Deposition.  And in that

20     we ask for anything, any file materials related to

21     this case.  As you probably can imagine, we've

22     already all sent requests for documents.

23              Do you have anything additional other than

24     what we would have gotten from the Georgia State

25     Patrol?

1        A.   No.

2        Q.   Okay.

3             (Defendant's Exhibit 2, Georgia Motor

4        Vehicle Crash Report, marked for

5        identification.)

6        Q.   (By Mr. Boorman) Then the next thing I'm

7   going to hand you is Exhibit 2, which I'll represent

8   to you is a copy of the Georgia Motor Vehicle Crash

9   Report.  And if you need to reference that at any

10  point, sir, feel free.  Obviously I know you've done

11  probably a lot of these crashes and you've probably

12  done a lot since so hopefully this will help.

13           Related to that, we have looked at your

14  report and looked at the codes and done our best to

15  highlight a code sheet.

16           (Defendant's Exhibit 3, Georgia Motor

17       Vehicle Crash Report Overlay, Cindy Cosper,

18       marked for identification.)

19       Q.   (By Mr. Boorman) So as Exhibit 3 I'm going

20  to hand you a highlighted code sheet that we believe

21  is for the codes listed for the vehicle and

22  specifically for Ms. Cosper or Ms. Pollard at the

23  time.

24           (Defendant's Exhibit 4, Georgia Motor

25       Vehicle Crash Report Overlay, Ronnie Ammerson,

1        marked for identification.)

2        Q.   (By Mr. Boorman) And we've done the same

3   thing for Mr. Ammerson and that's Exhibit 4.  Not to

4   overwhelm you with paper but I think this will

5   hopefully be helpful as we kind of move along.

6            And take your time looking at those code

7   sheets and just let me know when you're ready.

8        A.   There's no 52.  What's 52?

9        Q.   It's funny that you seized on that because

10  that was going to be one of my questions to you.

11  We've searched various versions of code sheets and

12  the only explanation that I can come up with is it

13  might have been a typo.

14       A.   Well, no.  Well, like I said, when we did

15  this report we didn't have this.  Like, I don't know

16  if -- when they did the update, it updated all of the

17  previous crash reports because it was a drop-down box

18  on our -- on the time of the accident.

19       Q.   Okay.  This is really, really helpful.  So

20  just kind of walk me through when you -- at the time

21  you filled out the report that is Exhibit 2.

22       A.   This was not the report.

23       Q.   What was the report?  Was it online?

24       A.   Yes, it was online report, just like this

25  one is now.  This was, like, the original report when

1    I first came out of trooper school in 2006.

2         Q.   **Okay.**

3         A.   Same codes.  It's -- and then they did an

4    update in 2009 or '10.

5         Q.   **Okay.**

6         A.    And then they just went back to this, like,

7    2017, 2018.  So the other report, all this was the

8    same:  The name, date of birth, all this.  But all

9    these codes was you click on it and it was drop-down

10   box instead of using codes.

11        Q.   **Okay.**

12        A.   So I don't know what 52 -- I don't know how

13   52 got on there.

14        Q.   **Well, I'm glad we're not alone.**

15        A.   Okay.

16        Q.   **Because we didn't know how it got on there**

17   **either.**

18             **I'll tell you what --**

19        A.   And "changed lanes improperly," that

20   wouldn't have been what I put on there either.

21   Because I have worked a wreck since, you know,

22   recently and where they failed to maintain their

23   lane.  And it was not "changed lanes improperly."  I

24   think they had us put 36 and we would explain in the

25   Narrative that it was, like, failure to maintain

1   lane.

2       Q.   Okay.

3       A.   Because there's not a failure to maintain

4   lane in this code section now.

5       Q.   I got you.  Thank you so much for

6   explaining that.

7            All I can tell you is what is Exhibit 2 is

8   what we got from the Georgia State Patrol.  But it

9   sounds like they tried to do some sort of upgrade and

10  maybe it didn't come through.

11      A.   Uh-huh.

12      Q.   There is -- we actually have another

13  version of this report that we can get from a third

14  party.  And so we're going to print that out.  I'm

15  going to have you take a look at that maybe instead.

16  And --

17      A.   Okay.

18      Q.   And so I'll tell you what.  For right now

19  let's just push that stuff to the side.

20      A.   Okay.

21      Q.   And we can move on to something else as I'm

22  getting that printed out.

23            But I would like to show you the next thing

24  and hopefully you recognize this.

25            (Defendant's Exhibit 5, Georgia Uniform

1      Traffic Citations, Summons and Accusation,

2      marked for identification.)

3          Q.   (By Mr. Boorman) Exhibit 5 is a Georgia

4   Uniform Traffic Citation.  And if you can tell me,

5   sir, do you recognize your signature on this

6   anywhere?

7          A.   Yes, sir.

8          Q.   All right.  Just tell us the date that you

9   filled this out and what this is.

10         A.   This is just a traffic citation.  The wreck

11  occurred on December 25th.  So I wrote the ticket on

12  December 25th.  The -- Cindy Pollard was present

13  during the time that I wrote the citation and she did

14  sign it.

15              How -- how I work traffic accidents, if

16  there's any property damage or injuries to anybody

17  other than the driver, I usually write a citation in

18  the accident.  So she did fail to maintain her lane

19  and had an accident.  So I did write her a citation

20  for failure to maintain lane.

21         Q.   Okay.

22         A.   And two numbers on here is just her number

23  and alternate number, just in case if I needed to get

24  in touch with her with any -- any more details about

25  the wreck or anything.

1       Q.   Yes, sir.  Okay.  Thank you.

2            You can put that to the side.

3            (Defendant's Exhibit 6, Color copies of

4       photographs, marked for identification.)

5       Q.   (By Mr. Boorman) And then the next thing

6  I'll give you that, again, I hope is familiar to you

7  is Exhibit 6.  And you'll see on Exhibit 6 in the

8  bottom right-hand corner there are -- there's a name

9  Ammerson as well as numbers at the bottom.  Those are

10  just markings for this case.  I know you didn't put

11  those on there.

12      A.   No.

13      Q.   But after you had a chance to look through

14  those photos, do these photos accurately depict the

15  scene and the vehicles shortly after the crash?

16      A.   Yes, sir.

17      Q.   Okay.  And are you aware of any other

18  photos related to this crash?

19      A.   No, sir.

20      Q.   Did you take those photos that we just

21  marked as Exhibit 6?

22      A.   Yes, sir.

23      Q.   On what camera?  And do you still have

24  copies of them?

25      A.   I don't know what camera I -- I took it on.

1    I don't know if it was -- I used a Post camera.  I

2    don't know if I had to use a phone.  But I do not

3    have any copies of it no more and I was -- told him

4    previously that I usually take pictures if there are

5    serious injuries.

6           After 30 days our -- our policy is if they

7    die -- if anybody becomes deceased after 30 days, we

8    don't consider it as a fatality report.  So after

9    30 days, I'll know if -- if -- if -- when I left

10   there I don't know if it's on that camera but I don't

11   have the pictures.

12       Q.   Okay.

13       A.   No more.

14       Q.   **What was your process for when you take**

15   **photos at this period of time?  You take them and**

16   **then would you turn them into the Georgia State**

17   **Patrol or what would you do with them?**

18       A.   If -- if it was, like, really serious

19   injuries where it would be prosecutable injuries then

20   I would turn them in.  If -- if it comes up -- I

21   mean, I'm not meaning in the vicinity of kind of way

22   that you can cut your finger in Haralson County and

23   they will Life Flight you.  So, like, sometimes you

24   don't know how serious the actual crash is.

25       Q.   Got you.

1      A.   So I kept them for a little bit.  And like

2   I said, I don't know if I turned -- I don't know if I

3   took it with a -- an actual -- because the State did

4   provide a camera.  But I don't know if I took it

5   with -- with that camera or if I used a phone.  I

6   can't remember.

7      Q.   Okay.  The reason why I'm asking you so

8   many questions is you did a really good job of

9   photographing, marking and photographing the scene.

10  And we would love the best quality pictures, you

11  know, the digital files called jpeg files.

12          Do you have any idea where we could try to

13  find those?

14     A.   You could try calling the Paulding Post.  I

15  turned that camera in.  I don't know if it's on it or

16  not.  When I left Paulding I turned everything in

17  because that was Paulding's stuff.  But like I said,

18  I left Paulding in 20 -- December of 2016.

19     Q.   Okay.

20     A.   So I don't know if they reissued it, if

21  they deleted the photos.  I don't know.

22     Q.   I got you.  Okay.

23          Then on the day of this crash, do you

24  recall having in-car video?

25     A.   Yes, sir.

1          Q.   All right.  Then I'll tell you what I'm

2    going to do.  I'm going to mark as Exhibit 7 a copy

3    of the in-car video.

4               (Defendant's Exhibit 7, *Copy of in-car

5          video, marked for identification.)

6          Q.   (By Mr. Boorman) And for the purpose of the

7    transcript, we can decide whether I just want to

8    attach the actual file on a thumb drive or a screen

9    shot of it but we all have the same video.

10              But I'm just going to show you -- so I'm

11   going to show you just at the minute and 25-second

12   mark and we'll talk about this more in a second.  But

13   I just want to see if this -- do you recall this

14   scene as you pulled up to it?

15         A.   Yes, sir.

16         Q.   Okay.  And I'm going to ask you more

17   specific questions kind of as we move along.  But I

18   just want to make sure this video, in-car video, is a

19   fair and accurate depiction of the scene of the crash

20   shortly after the crash occurred.

21         A.   Yes, sir.

22         Q.   Okay.

23              (Defendant's Exhibit 8, State of Georgia

24         Traffic Crash Report, marked for

25         identification.)

Page 16

1      Q.   (By Mr. Boorman) All right.  And let me

2  see.  I'm marking as Exhibit 8 -- you'll notice that

3  I will take help from anyplace I can get.

4           That's Exhibit 8.  And so here's another

5  copy of the Crash Report.  And I'll tell you I think

6  we were able to purchase this from BuyCrash.

7           If you can look on the second page of this,

8  is that your signature, sir?

9      A.   Yes, sir.

10     Q.   Okay.  Just because we're obviously dealing

11 with couple different copies of the Crash Report,

12 could you just take a minute to look at this and tell

13 us if this looks like what you filled out at the time

14 of the crash?

15     A.   Yeah.  This is the actual Crash Report that

16 we used at the time of the crash.  And it's easier to

17 read because there's no codes.

18     Q.   We were trying to just use the official one

19 but apparently the official one is not the best one

20 in this case.

21     A.   Huh-uh.

22     Q.   So we'll use this one, then.  Okay.  Great.

23 I'm glad we looked at that.

24           You just let me know when you're done

25 looking at it.

1        A.    Oh, yeah, I'm done.

2        Q.    Okay.  I'm just doing a little

3    housekeeping, so --

4        A.    Okay.

5        Q.    I'm going to keep the stuff that we don't

6    need out of your way, the stuff that we've already

7    handled and then this stuff we will need.

8        A.    Okay.

9        Q.    Now that you've had just a moment to look

10   at Exhibit 8, you saw your signature on there,

11   correct?

12       A.    Yes, sir.

13       Q.    Is that a full copy of your Crash Report?

14       A.    Yes, sir.

15       Q.    Did you take any statements?  And this is

16   not trying to be a trick question.  Obviously we're

17   going to listen to some things that are on the in-car

18   video.  But did you take any separate written

19   statements?

20       A.    No.  I talked to someone at the crash.

21   They seen the last bit of the crash.  But if you

22   don't see the whole crash that's not a witness to me.

23   So I didn't get a -- I heard what she said.  But I

24   didn't get a name because she wasn't a full witness.

25       Q.    Understood.

1        A.   And I just got the drivers' statements.

2        Q.   And did you talk to her at the scene, this

3   person that you're talking about on the video?

4        A.   Uh-huh.

5        Q.   Okay.

6        A.   Yes, sir.

7        Q.   All right.  Did you take any notes during

8   your investigation?

9        A.   No.

10       Q.   Okay.  Did you see anyone taking notes at

11  the scene?

12       A.   No, sir.

13       Q.   Did you take any measurements at the scene?

14       A.   No, sir.  I just marked the scene.

15       Q.   Got you.

16            And we see that in the photos.  But you

17  didn't run a tape?

18       A.   No, sir.

19       Q.   Did you see anybody taking any measurements

20  at the scene at the time of the crash?

21       A.   No, sir.

22       Q.   Were there any Vehicle Inventory Sheets

23  completed?  Sometimes I see those with these reports.

24       A.   Let me see.  I know Wingo has got it.  I

25  think usually when there's stuff slung out, like

1    there was in that crash, I usually tell -- because

2    she had another family member there.  I usually tell

3    them to go get whatever is valuable because there's

4    so much stuff --

5        Q.   Right.

6        A.   -- it's hard to write down every single

7    thing.

8        Q.   Right.

9        A.   So I -- I -- I tell them to go get anything

10   that's valuable out of the vehicle where if it comes

11   up missing, you're not going to be, like, trying to

12   sue Wingo's.

13       Q.   Right.

14       A.   So I don't know if I did inventory or if

15   that's what I just told them.  Because it was a bunch

16   of, like, in the pictures, it's just -- I hate to say

17   it but it looks like just a bunch of junk.

18       Q.   Right.

19       A.   I mean, that's not theirs.  That's the Fire

20   Department's.

21       Q.   Right.

22       A.   But it's just -- it looks like a bunch of

23   junk.

24       Q.   Sure.  Okay.

25            Did you retain any physical evidence that

1    you would have given to the Police Department or

2    would have put somewhere else?  Sometimes people take

3    tire treads or certain things from the vehicle or

4    anything.  Do you know if you retained any?

5        A.   No.

6        Q.   Okay.

7        A.   If it's laying out there, the -- the

8    wrecker driver throws it back into the car and loads

9    it up.

10       Q.   Understood.

11            So what I've tried to do is just make sure

12   that I've given you everything that I'm aware of that

13   you would have generated or seen.  Are you aware of

14   any other documents, videos or photos related to this

15   crash?

16       A.   No.

17       Q.   We're already done with one thing.

18       A.   Okay.

19       Q.   So we got two to go.

20       A.   All right.

21       Q.   What I want to do now is -- and we tried --

22   I apologize.  We should have requested -- we can get

23   a Post report --

24       A.   Uh-huh.

25       Q.   -- that just gives your background and the

1    courses that you've taken.  And it's my mistake.  I

2    should have gotten that sooner so I could go through

3    this quickly but I just didn't get that in time.

4         A.   Okay.

5         Q.   So what I'd like to do is just get some

6    brief background on you and the first thing is about

7    your education.  Where did you go to high school and

8    what year did you graduate?

9         A.   Haralson County High School and I graduated

10   in 2002.

11        Q.   All right.  And did you go to any schooling

12   after high school?

13        A.   No, I graduated in May and I started the

14   State Patrol in November.

15        Q.   Of 2002?

16        A.   Uh-huh.

17        Q.   Wow.  Okay.

18             So your first job out of high school was

19   with the Georgia State Patrol?

20        A.   Yes, sir.

21        Q.   And what was your title?

22        A.   I was a communications -- it's called CEO.

23   Communications Enforcement Officer.  But it's a radio

24   operator.

25        Q.   I got you.

Page 22

1      A.   Yeah.

2          Q.   And how long were you in that role?

3      A.   I had to do that for three years.  I had to

4  be 21 before I go to trooper school.

5          Q.   Okay.  So that brings us up to about '05?

6      A.   I went to trooper school January 1st of

7  2006.

8          Q.   Got you.

9               And when did you graduate from trooper

10  school?

11     A.   August 18th, 2006.

12         Q.   Okay.

13              After you graduated trooper school what was

14  your next job or position?

15     A.   I was a trooper out of the Villa Rica Post.

16         Q.   Okay.  And how long were you in that

17  position?

18     A.   I'm -- I'm still a trooper.  You just go up

19  in ranks.  They came out with a -- a TFC 1, 2 and 3

20  in order of pay raises.

21         Q.   Okay.

22     A.   In order to get the pay raises you had to

23  take special certain classes.  So my classes was

24  Recon I, Recon II and Recon III where I can get all

25  my raises.

1        Q.    Okay.

2        A.    So I'm still a TFC 3.

3        Q.    Okay.  And if I understand kind of the

4    instruction courses correctly, are they still

5    training troopers with On-scene I and On-scene II?

6        A.    Yes, sir.

7        Q.    Do you recall when you completed those

8    courses?

9        A.    That was in -- while I was in trooper

10   school.  So it was sometime --

11       Q.    2006?

12       A.    2006.

13       Q.    Understood.

14             When did you take -- did you say you took

15   Accident Reconstruction Levels I through III?

16       A.    I, II and III.  I took them, let's see,

17   2007, 2008.

18       Q.    Okay.  And did you reconstruct accidents or

19   did you just have that as kind of background?

20       A.    In the class you have to go out there

21   and -- and do it.  They teach you how to do, like,

22   you're on the SCRT Team.  But that's just the -- we

23   had to take those classes to get the raises.

24       Q.    Okay.

25       A.    So I later took Recon IV and V just to say

Page 24

1    I -- I had it, just to say if I wanted to be on the

2    SCRT Team.

3         Q.   Okay.  And it only goes up to V, right?

4         A.   Yes, sir.

5         Q.   Okay.  When did you complete Reconstruction

6    IV and V?

7         A.   2014.

8         Q.   Okay.  So you had completed Levels I

9    through V prior to this crash?

10        A.   Yes, sir.

11        Q.   Other than the reconstructions that you did

12   as part of your training, you never joined the SCRT

13   Team, did you?

14        A.   No, sir.

15        Q.   Okay.  Did you ever reconstruct an accident

16   as part of your job duties?

17        A.   No, sir.

18        Q.   Okay.  And in this case, you did a great

19   job of marking and documenting and photographing the

20   scene.  But did you ever attempt to reconstruct this

21   accident?

22        A.   No, sir.

23        Q.   Okay.  Got it.

24             As you sit here today, your title -- is it

25   Trooper First Class Level 3?  Do I have that correct?

1          A.   However you want to put it.

2          Q.   **Okay.**

3          A.   It's TFC 3.  TFC -- I mean, there's really

4     no -- I'm still just classified as a trooper.

5          Q.   **Okay.  I just want to get a little bit**

6     **better sense of what your job duties were.**

7               **So from 2006 when you first became a**

8     **trooper with the Villa Rica Post --**

9          A.   Uh-huh.

10         Q.   **-- what were your job duties at that point?**

11         A.   To enforce traffic law.  So at that time I

12    think the Villa Rica was probably the busiest Post in

13    the State of Georgia.  So we -- we worked a lot of

14    wrecks.

15              So crash investigation was our -- pretty

16    much our main goal in Villa Rica.  And then you just

17    stop cars when you could --

18         Q.   **Okay.**

19         A.   -- enforce traffic law.  Assist other

20    agencies if needed.

21         Q.   **Okay.**

22         A.   So --

23         Q.   **And how long were you doing that with**

24    **Villa Rica?**

25         A.   I stayed in Villa Rica from August of '06

1    to April of '09.

2         Q.   Okay.  And then what did you do starting

3    April of '09?

4         A.   I transferred to Cedartown.

5         Q.   Okay.  And what were your job

6    responsibilities in Cedartown?

7         A.   Same thing.  Crash investigation, enforce

8    traffic law.

9         Q.   And how long were you doing that?

10        A.   I was in Cedartown until they closed it

11   down of October 2012.  I stayed in that territory,

12   just worked out of Rome for 2014.  Then they moved us

13   to Cartersville and then they moved us to Paulding.

14             But it was the same thing:  Crash

15   investigation, traffic law, enforce traffic law.

16        Q.   I got it.

17        A.   I just moved all over the northwest.

18        Q.   So where is your Post now?

19        A.   I am under Trooper C command.  I'm in the

20   Implied Consent Division.

21        Q.   And when did you take that post?

22        A.   December of last year.  And I left Paulding

23   to go work at the Capitol Security for the Georgia

24   State Patrol from 2016 to 2018.

25        Q.   So you were working as a trooper enforcing

1    traffic laws from '09 to 2012, is that right, at

2    Cedartown?

3         A.   Yes, sir.

4         Q.   And then from '12 to '16 you were kind of

5    doing the same thing but at various locations --

6         A.   Yes.

7         Q.   -- in northwest Georgia?

8         A.   Yeah.   Rome, Cartersville and Paulding.

9         Q.   And then '16 to '18 you were doing security

10   at the Capitol?

11        A.   Yes, sir.

12        Q.   And since December of '18, you were working

13   with Troop --

14        A.   Troop C command.

15        Q.   And tell me what you're doing there.

16        A.   I certify and -- intox machines.   So the

17   breath machines where someone does a breath test.   I

18   run the test on that to make sure everything is

19   working properly and I keep everything updated.

20        Q.   Okay.   And are you out in the field or are

21   people just bringing you those machines?

22        A.   No, I go to different locations in Fulton,

23   DeKalb and Clayton Counties.   That's my area.

24        Q.   Okay.   And you're just kind of going

25   regularly to make sure that those machines are --

1        A.   Up and running.

2        Q.   Gotcha.  Understood.

3             Okay.  Great.  Have we covered your

4    complete timeline of your work history --

5        A.   Yes, sir.

6        Q.   -- in law enforcement?

7        A.   Yes, sir.

8        Q.   Great.

9             Then I think I have -- you know, I think

10   we've already talked about the fact you have On-scene

11   I and II.  You have Accident Construction I through

12   V.  Are there any other courses that would in any way

13   relate to your investigation of this crash that we

14   should know about?

15       A.   No, sir.

16       Q.   All right.

17            All right.  Now, here's the question you

18   get to brag on.  All right.  What is your best

19   estimate of how many crashes you have investigated?

20   And best estimate is good enough for us.  Is it 500,

21   2,000?

22       A.   We would probably work 300 apiece or more a

23   year in Villa Rica.  So I was in Villa Rica for two

24   and a half years.  And then, let's see, that's about

25   600.  Paulding was about -- I probably -- maybe

1    2,000.  2500 maybe.

2         Q.   Okay.

3         A.   I don't know.

4         Q.   Okay.  Understanding we're not looking for

5    a, you know, precise number.

6         A.   Oh, yeah.

7         Q.   But your best estimate is somewhere around

8    2,000, 2500?

9         A.   I would say something like that.

10        Q.   Okay.  And while you haven't reconstructed

11   any accidents in the field, how many accidents do you

12   think you've reconstructed in your courses?

13        A.   In the training?

14        Q.   Yes.

15        A.   I think we've done one every -- every --

16   like, Level I you would do one.  Level II you would

17   do one, like, you would go out there and you'd do it

18   as a team.

19        Q.   Understood.

20        A.   Now, me doing one completely by myself,

21   never.

22        Q.   Okay.  Gotcha.

23             So if we're estimating, you know, around

24   2500 crashes that you've investigated, can you give

25   us an estimate of about how many rollovers you've

1    investigated?  Is it more than ten?

2        A.  Oh, yes, it's more than ten.  Probably a

3    couple hundred.

4        Q.  Okay.

5        A.  Yeah.

6        Q.  And have you seen all types of vehicles

7    roll over, SUVs, sedans, you know, kind of passenger

8    cars?

9        A.  Yes.

10        Q.  Have you seen basically most types --

11        A.  Yes.

12        Q.  -- of vehicles roll over?  Okay.

13             Have you ever experienced a rollover as an

14    occupant, whether a driver or a passenger?

15        A.  Have I ever been in a rollover?

16        Q.  Yes, sir.

17        A.  No, sir.

18        Q.  Okay.

19        A.  Well, yes, sir, I have been.  I have been

20    in a crash where I flipped, yes, sir.

21        Q.  Okay.  There's a surprising --

22        A.  I forgot about that one.  Yeah.

23        Q.  There's a surprising number of people who

24    have been.

25        A.  Yeah.

1          Q.   Was that on the job or was this before you

2     were --

3          A.   I was 16.

4          Q.   Okay.  Gotcha.

5          A.   Yeah.

6          Q.   What kind of vehicle were you in?

7          A.   I was in an S-10.

8          Q.   Okay.  And were you injured as a result?

9          A.   Broke my wrist.

10         Q.   But that's it?

11         A.   Uh-huh.

12         Q.   Anybody else injured in the vehicle?

13         A.   No, it was just me.

14         Q.   Okay.

15              It sounds like you've driven probably

16    pickup trucks.  I understand that.

17         A.   That was my first car.

18         Q.   Okay.

19         A.   Vehicle.

20         Q.   Have you driven SUVs?

21         A.   Yes, sir.

22         Q.   Kind of as your primary means of

23    transportation?

24         A.   I used to have a Suburban.  So yeah.

25         Q.   Do you think SUVs handle differently than

1      passenger cars?

2                  MR. PARRISH:  Object to form.

3          A.    Yes.

4          Q.    (By Mr. Boorman) And this is a long shot

5      but I'm just going to ask it.

6                  Have you ever spoken at any seminars or

7      anything like that, done any training for other

8      folks?

9          A.    No, sir.

10         Q.    Okay.  Have you ever been -- there are

11     certain experts, I'm sure you've heard about this,

12     like, we all have experts that we've hired in this

13     case.

14                 Have you ever been hired by a lawyer to be

15     an expert in any lawsuit?

16         A.    No, sir.

17         Q.    And I believe you've given two depositions

18     before; is that right?

19         A.    Yes, sir.

20         Q.    Have you ever testified at trial?

21         A.    Yes, sir.

22         Q.    How many times have you testified at trial?

23         A.    Crashes or just DUIs or --

24         Q.    I'm talking everything.

25         A.    Fifteen to 20 times maybe.

1      Q.   Okay.

2      A.   Yeah.

3      Q.   And have you been qualified as an expert at

4  trial or are you just coming in to say, "This is what

5  I observed"?

6      A.   This is what I observed.   I worked the

7  accident.   This is -- or -- or DUI cases.

8      Q.   Gotcha.

9      A.   Not -- not expert.

10      Q.   Gotcha.

11          Have you ever given an opinion that any

12  product is defective?

13      A.   No, sir.

14      Q.   Okay.   And has your -- you may not know

15  this.   But has your testimony ever been limited in

16  any way, like --

17      A.   Saying I couldn't use --

18      Q.   Couldn't say something that you intended to

19  say.   You may not know that.   But I'm just -- to your

20  knowledge, has it ever been limited?

21      A.   Not -- not that I'm aware of.

22      Q.   Okay.   All right.

23      A.   I mean, you can't -- you can't say in a DUI

24  trial what they blow on the Alco-Sensor.

25      Q.   Okay.

1          A.   All you can say is positive and negative.

2    That's the only thing that you cannot say if that's

3    what you're talking about.

4          Q.   Okay.  Yeah.  I just wanted to know if --

5          A.   No.

6          Q.   -- there were any parameters kind of put on

7    your testimony.

8          A.   Yeah.  You can't -- you can't testify on

9    what they blow on Alco-Sensor.  You can just say

10   positive or negative.

11         Q.   Ha.  I didn't know that.  Okay.

12              Have you ever worked for any auto

13   manufacturer?

14         A.   No, sir.

15         Q.   All right.  Other than working for the

16   Georgia State Patrol, have you had any other jobs

17   after high school?

18         A.   I was in high school, I worked at a grocery

19   store bagging groceries.

20         Q.   Okay.  But you never -- did you ever work

21   at, like, car repair shop or --

22         A.   No.  Nope.  No, sir.

23         Q.   Okay.

24              And this crash involves a 2000 Ford

25   Explorer.  Have you ever driven a Ford Explorer?

1    A.   My friend's Ford Explorer, yes, sir.

2    Q.   Okay.  Do you have any idea what model year

3  that may have been?

4    A.   That had to have been, like, in the

5  nineties --

6    Q.   Okay.

7    A.   -- because we was young.

8    Q.   Did you drive that more than ten times?

9    A.   No.

10    Q.   Okay.  And what vehicles do you currently

11  own?

12    A.   I have a Jeep.  I have a Mustang and I have

13  a truck.

14    Q.   And what kind of Jeep is that?

15    A.   It's a 2016 Jeep Wrangler.

16    Q.   Did you take that JeepFest?

17    A.   No, I'm not that -- I'm not that hard core.

18    Q.   I drive by that JeepFest course all the

19  time.  We got a cabin up that way.

20       And what year is your Mustang?

21    A.   '05.

22    Q.   Okay.  And what kind of truck do you have?

23    A.   '94 Z71.

24    Q.   All right.  I understand that you probably

25  don't know but I just want to make sure.

1             For this specific 2000 Ford Explorer that

2    was involved in this crash, do you know what the

3    service and repair history was?

4         A.   No, sir.

5         Q.   Do you know whether it had been involved in

6    any other crashes prior to this crash?

7         A.   No, sir.

8         Q.   And I'm going to ask you a couple more

9    specific questions when we look at photos.  But since

10   you had a chance to look, just kind of flip through

11   them real quick.

12            Did you make any observations about the

13   condition of this Explorer and what it may have been

14   prior to the crash?

15        A.   No, sir.

16        Q.   Okay.

17            All right.  To the third part.

18        A.   All right.

19        Q.   Moving along quickly.  And do you need a

20   break?

21        A.   No, sir.

22        Q.   Or are you still good to go?  Okay.  We'll

23   obviously spend more time on this because we're going

24   to talk about the crash and a few things.

25        A.   Okay.

1      Q.    So am I correct this crash happened on

2  Christmas, December 25th of 2015?

3      A.    Yes, sir.

4      Q.    All right.  And the crash happened

5  approximately 3:34 p.m.?

6      A.    Yes, sir.

7      Q.    And, you know, we're -- I'm just trying to

8  make sure that I'm confirming what's in the Police

9  Report but please double-check me.

10          And it looks like -- did you arrive at

11  about 3:45 p.m.?

12     A.    Yes, sir.

13     Q.    And you left at 4:58 p.m.?

14     A.    Yes, sir.

15     Q.    All right.

16          And this crash happened on Corinth

17  Poseyville Road in Haralson County?

18     A.    Yes, sir.

19     Q.    Are you pretty familiar with that road this

20  crash was on?

21     A.    Yes, sir.  I live, like, 35 minutes from

22  it.

23     Q.    Okay.

24     A.    Uh-huh.

25     Q.    Was this an area where there was a lot of

1  crashes or not really?

2      A.   Usually when there's a crash on this road

3  it's a pretty serious crash.

4      Q.   Do you have any idea why that is?

5      A.   No, I don't.

6      Q.   Okay.

7      A.   I mean, it's curvy.  But it shouldn't be

8  where you would wreck all the time.

9      Q.   Okay.

10      A.   Which I'm not saying there's a lot of

11  wrecks out there.  I'm just saying but when there are

12  wrecks they're usually pretty serious wrecks.

13      Q.   A country road that people maybe go a

14  little faster than they might ought to?

15      A.   Yes, sir.

16      Q.   Okay.  So who was the driver of this 2000

17  Explorer?

18      A.   Cindy -- wait.  Wait.  Wait.  Making sure.

19           Yes, Cindy Pollard.

20      Q.   Yes.

21      A.   Yes.

22      Q.   And I won't try to do this intentionally

23  but I believe her name is Cindy Cosper now.

24      A.   Okay.

25      Q.   But just so you know --

1        A.    Okay.

2        Q.    -- I'm going to try to use Pollard because

3    that's what's in the report.

4              And was the front passenger Mr. Ronnie

5    Ammerson?

6        A.    Yes, sir.

7        Q.    Okay.

8              And I want to get back to the video for a

9    second.  And I'm going to start the video at 1:30 and

10   then I'm going to show it to you just until basically

11   we can see you get out of the car and then I'll mark

12   the time of that.  Stop me if there's anything that

13   you want to comment on.

14             All right.  And I'm stopping the video at

15   around 1:57.

16       A.    Okay.

17       Q.    Do you recognize -- is that you that gets

18   out of the car around 1:50 or something like that?

19       A.    Yes, sir.

20       Q.    All right.  Who was already on the scene

21   when you get there?

22       A.    There's a Haralson County deputy.

23       Q.    Do you remember who that is?

24       A.    He's a sergeant now.  I'm trying to think

25   of his name.

1          I don't know his name.

2      Q.  That's okay.  We --

3      A.  I've been gone from there for about three

4  years.  So it's hard to --

5      Q.  We've got documentation.  I just want to --

6  but we may not have perfect documentation about kind

7  of who got there exactly when.

8      A.  Yeah, he was there before me.  There was

9  another sergeant.  I got his name.  Randy Entrekin.

10  He showed up later.  He was the other deputy that

11  showed up.  And then there was Haralson County Fire

12  Department.

13      Q.  Okay.  Then I'm going to show you a little

14  more video.

15          You walk up to somebody.  And I want to

16  make -- and I think we're all going to -- I think we

17  all know that that's Ms. Pollard or Ms. Cosper.  And

18  I just want to see if you recall that.  So I'm going

19  to start it again at 1:57.

20          (WHEREUPON, a video was played.)

21      Q.  (By Mr. Boorman) And I stopped it at about

22  two minutes and 30 seconds.

23          Are you at that point approaching

24  Ms. Pollard?

25      A.  Yes, sir.

1    Q.   Okay.  As you could hear, the audio was a

2    little bit tough to hear.

3    A.   The fire trucks is really loud.

4    Q.   Okay.  And I might ask you some questions

5    about a conversation a little bit later.  But do you

6    recall what Ms. Cosper told or Ms. Pollard told you?

7    A.   She told me that she was -- I watched the

8    video the other day.  So she was on her way from

9    Bremen so that was the correct direction she would be

10   traveling.

11          And I asked her if she had been drinking.

12   She said no.  Asked her if she had taken any kind of

13   medication.  She said no.  I didn't smell anything.

14   I didn't observe anything in her eyes that would, you

15   know, possibly think otherwise.

16          And I asked her what happened.  She said

17   that she had -- was thinking about other things and

18   ran off the road.  And I asked her if she was

19   speeding.  She said she wasn't speeding.  And I said,

20   "So you run off the road and overcorrected and lost

21   control" and she said yes.

22   Q.   Okay.  I'm going to play at 5:10 and

23   hopefully we can hear this okay.  But basically some

24   of what you just said.

25          (WHEREUPON, a video was played.)

Page 42

1       Q.   (By Mr. Boorman) All right.  That

2   conversation, that clip that we just listened to that

3   starts at about 5:10, that's exactly what you just

4   told us, right?

5       A.   Yes, sir.

6       Q.   And while there is some background noise,

7   you can hear Ms. Pollard say that she was thinking

8   about something else and went off the road?

9       A.   Yes, sir.

10      Q.   All right.  Did she make those statements

11  shortly after the crash?

12      A.   Yes, sir.  I got there pretty quick.  You

13  know, I was -- on Christmas Day how we do things, we

14  work in segments so we can stay at the house.  Even

15  though you're on call, you just got to be -- once you

16  get a wreck you have to leave.

17           Luckily that was right by my house so the

18  only thing I do is put my uniform on and go.  So --

19  or if I had my uniform on I probably been there even

20  faster.

21      Q.   Understood.

22      A.   So --

23      Q.   So you were there just within minutes of

24  this crash happening?

25      A.   Yes.

1      Q.   Was it your observation that Ms. Pollard

2   was still visibly shaken up from the crash?

3      A.   Yes.  You can hear it in her voice that

4   she's -- she's still shaken up from the crash.  And

5   also their dad was still being cut out of the car.

6   Or not -- you know, the seat belt was -- had him

7   pinned up where they had to cut the seat belt off

8   him.

9      Q.   And I can play you the clip.  But do you

10   recall later is she gets upset and is crying, talking

11   to you?

12      A.   Yes.  And I'm writing, explaining the

13   ticket, she's crying.

14      Q.   Okay.

15      A.   Want to know -- I think I even told her how

16   to get to Grady.

17      Q.   Okay.  So I know you weren't there but I'm

18   wondering if you may have learned this at some point.

19   Do you know who the first person to Ms. Pollard was?

20      A.   No, sir.

21      Q.   Do you know who the first person to

22   Mr. Ammerson was?

23      A.   No, sir.

24      Q.   Okay.  Do you know who provided treatment

25   to Ms. Pollard?

Page 44

1      A.  No, sir.  When -- usually I don't -- when

2    they're working, like, they -- like, they were

3    cutting the vehicle, trying to get him out, I stay

4    back because I don't want to get in their way.  I'm

5    not trained like they are.

6        So I try to get everything I need before I

7    go talk to -- but luckily -- I mean, not luckily but

8    I didn't really need to speak to him because he

9    wasn't my driver.

10    Q.  Understood.  Okay.

11        So do you have a written protocol for

12    investigating an accident that you would use at the

13    time, that you used at the time of this crash?

14    A.  No, sir.  Every -- every trooper is

15    different.  That's part of the last three months of

16    trooper school.  We get sent to a different Post

17    every month to ride with someone different.  To see

18    how they work.  And we just try to put it -- how

19    it's -- kind of like you see everybody's way of

20    working and then you just come up with your own.

21    Q.  Understood.

22        Did you, while not written down, did you

23    kind of have your own kind of procedural or process

24    that you would use for investigating an accident or

25    would it depend based upon what you were rolling up

1    on?

2        A.    It really depends on what you're rolling up

3    on.  If I have a crash like this where I know a

4    helicopter is coming, I try to get all the

5    information that I can at that time where I don't

6    have to go to Grady or go to Atlanta Medical if I

7    don't have to go.

8        Q.    Okay.

9        A.    So I was trying to get all the information,

10   his information, just in case where I didn't have to

11   drive to Atlanta Medical Center or Grady.

12       Q.    Okay.  And I think the video, the in-car

13   video that I have, is about -- it's right at about

14   32 minutes or something along those lines.

15       A.    Uh-huh.

16       Q.    Maybe 33 minutes.  I understand you

17   recently had an occasion to, you know, take a look at

18   that.  I'm happy to play you any part of that or the

19   whole thing.

20            But what I'd like to know is, can you just

21   walk us through what you did and what you observed at

22   the scene?  And I'm happy to show you any photo or

23   you can look at any photo or look at the video.

24       A.    No.  Once I got her statement and once I

25   got all the information that I needed from him, they

1     gave me his ID card.  So we had computers in our car.

2     So you just take all their information, run it back

3     to make sure everything is -- this is what they give

4     you.

5              So once I had all the information, Life

6     Flight came and got Mr. Ammerson.  And I tried to get

7     Cindy out of there as fast as possible.  I mean, that

8     is her father going to Grady.  So I was trying to get

9     her the information she needed.  Driver's license

10    back, explain how she can get a copy of the Accident

11    Report.  Where -- who to call for the Accident

12    Report.  And also issue her the citation and explain

13    the citation, where she could pay it or go to court.

14        Q.   Understood.

15        A.   Once I got all that out of the way is when

16    I started to try to move vehicles where I can

17    document everything on the road.

18        Q.   Okay.  Understood.

19             And then when you say "document everything

20    on the road," did you mark it with paint?

21        A.   Yes, sir.

22        Q.   All right.  And tell us what your practice

23    is.  And we can look at some of these photos in a

24    minute.  But what do you try to do with the paint

25    marks or are there things we should know about how

1   **you mark with paint?**

2       A.   One trooper taught me in Cartersville.  I

3   rode with seven different people in Cartersville.  I

4   don't even know who it was.  But we worked a serious

5   crash.  And he says, "You want to start off" -- she

6   ran -- she did run off the road a little bit further

7   back.

8            There was another vehicle that just backed

9   on up.  So instead of me trying to find out who it

10  was, I didn't -- I just started -- I seen where it

11  was.  It's a little bit further back where she ran

12  off and then I started to mark.

13           So when you have indentions off the roadway

14  we use flags.  So then when it gets on the roadway, I

15  usually mark skid marks and yaw marks by dots.  Once

16  those yaw marks or skid marks stop and you have a --

17  straight gouge marks or any other kind of damage, I

18  usually put it in, like, a parentheses where

19  something new was starting.  It don't mean anything

20  spectacular.  It's just how I work the wrecks.

21           So then you have -- and then once you have

22  this, then I go back to off the road where you have

23  back to flags.  And that's where I just put a flag

24  right there where the tires were.  So if -- if, let's

25  say, that Mr. Ammerson died later that night, I would

Page 48

1    have called the SCRT Team because it would have been

2    a SCRT Team wreck.

3            Now, in -- in Troop A, every troop is

4    different.  Because this is family, you would still

5    make the phone call to SCRT and say, "Hey, I had a

6    wreck today.  It was prosecutable.  The driver was

7    not drinking, there was no medications but she killed

8    her father."

9            They would probably said, "We're not coming

10   out there.  It's family."  They're not going to

11   prosecute family.  Just, you know -- but I marked it

12   just in case.

13       **Q.   Uh-huh.  Understood.**

14       A.   So -- but let's say Mr. Ammerson was a

15   friend and he would have died.  Then SCRT Team would

16   have came out.  All my stuff would already been

17   marked.  Then they would have took the actual

18   measurements.

19       **Q.   Does it have to be a fatality for SCRT to**

20   **come out or could it be a serious injury?**

21       A.   It could be a serious injury where you

22   have, like, paralyzed or, you know, coma or, you

23   know, something that's going to be life-changing.

24       **Q.   Understood.**

25       A.   They can come out there.  They can, you

Page 49

1   know, do the same thing as if it was a fatality.

2      Q.   Okay.  Then just a few check the box

3   questions I need to ask you.

4           After you left the scene on this day of the

5   crash, did you ever return to the scene for any

6   reason?

7      A.   To make sure any, like --

8      Q.   Do any additional investigation?

9      A.   No.  I came out, what was it, about a month

10  later, month or two later when you came out?

11          MR. PARRISH:  I'm not allowed to talk --

12          THE WITNESS:  Okay.

13          MR. PARRISH:  -- during this part.

14     A.   Okay.  Well, whenever we went back out, the

15  road had already been paved.  So there was nothing

16  there any more.

17     Q.   (By Mr. Boorman) Okay.

18     A.   But nothing -- nothing from me.  Nothing on

19  my end for a further investigation about this wreck.

20     Q.   Understood.

21          About a month after this crash, did you go

22  back out to the scene with Mr. Parrish?

23     A.   It was -- it was some -- I don't know if it

24  was a month or two.  But yeah, I went back out.  But

25  the road has already been paved and I just kind of

Page 50

1    put them in the spot where it happened.

2         Q.   Okay.  Was Mr. Parrish there at this

3    second -- at this visit to the scene?

4         A.   It's been so long ago.  There was two or

5    three guys.  I couldn't tell you if it was actually

6    him or not.

7         Q.   Okay.  Do you remember anybody or did you

8    write down anybody's name?

9         A.   No, I didn't write -- huh-uh.  No, sir.

10        Q.   Do you know if it was people who were

11   working on behalf of Ms. Pollard or Mr. Ammerson?

12        A.   I can't remember the full conversation.  I

13   just met -- went out there and -- and met with them.

14        Q.   Okay.

15             At that time, did you take any photos?

16        A.   No, sir.

17        Q.   Okay.  Did they take any photos?

18        A.   I -- I don't recall.

19        Q.   Did you take any statements?

20        A.   We just talked about the crash.  But

21   nothing where I would write anything down.  Like, I

22   don't even remember what I even said.  Probably the

23   same thing I'm -- I'm telling you.

24        Q.   Sure.

25        A.   But I really don't know what was said.

Page 51

1          Q.    Do you know if they recorded, either by

2     audio or video, anything that you were explaining?

3          A.    Not that I was aware of.

4          Q.    Okay.

5                After the day of this crash did you ever

6     see the Explorer again?

7          A.    No, sir.

8          Q.    And after the day of this crash did you

9     ever communicate with any of the occupants or

10    eyewitnesses?

11         A.    No, sir.  Usually the -- if he would have

12    died, the hospitals are pretty good about notifying,

13    even if it's, like, the person that they bring in.

14    And then they notify us that it became a fatality or

15    they'll notify our radio room.  So I don't really do

16    any checkups.

17               It's hard to get -- if you ever had to call

18    Grady, it's hard to try to get some good information.

19    So usually if something, a terrible outcome happens,

20    they usually notify us.

21         Q.    Understood.  Okay.

22               Other than this meeting about a month or

23    two after the crash, have you met with anybody else

24    related to this crash?

25         A.    I have but I don't know who they was

1      representing.  Someone came to the Capitol probably

2      2018.

3           Q.   Okay.

4           A.   Maybe.

5           Q.   But you don't remember who that is?

6           A.   I don't remember who it was.  I just know

7      it was a white gentleman.

8           Q.   Okay.

9           A.   Couldn't tell you his name.  Probably

10     wouldn't even tell you if he walked in right now who

11     it was.

12          Q.   Okay.

13          A.   He came up.  We talked about the crash.

14     Asked me similar questions about 30 minutes to an

15     hour.

16          Q.   Okay.

17          A.   And that was it.

18          Q.   All right.  Anybody else that you've met

19     with?

20          A.   No, sir.

21          Q.   All right.

22               Before this crash, did you know either of

23     these occupants, either Ms. Pollard or Mr. Ammerson?

24          A.   Did I know them?

25          Q.   Yes.

1        A.   No, sir.

2        Q.   Did you know anything about them or their

3    families or anything like that?

4        A.   No, sir.

5        Q.   Okay.

6             Other than what we discussed, did you do

7    any other investigation related to this crash?

8        A.   No, sir.

9        Q.   Then I want to show you a couple things and

10   I'm going to apologize.  But I'm just -- to move

11   through this quickly --

12       A.   Okay.

13       Q.   -- I'm going to take some of the photos out

14   and then we can put them back in order if you want.

15   But let me just show you -- and I guess before I do

16   that, we've been going over an hour.  Do you need a

17   break?

18       A.   No, I'm good.

19       Q.   Okay.  You just let me know if you do.

20       A.   Okay.

21       Q.   So I'm going to show you what -- at the

22   bottom numbers is what I'm talking about.  79 through

23   81.

24             Are those the photos of the point of rest

25   of this Explorer?

1     A.   Yes, sir.

2     Q.   Okay.

3          If you can take a look at Photo 80 and tell

4     me what debris is around there.  Can you identify

5     anything for us?

6     A.   Of the vehicle or are you just talking

7     about, like, bags and clothes and bottles and --

8     Q.   Yeah.  Anything that stands out to you that

9     you believe was in the vehicle.

10    A.   I can't remember if that was a Bud Light

11    can or -- but I don't know.  But I did notice that.

12    But -- but it's just mainly junk.

13    Q.   Okay.  Gotcha.

14    A.   Yeah.  And like I said, all the stuff,

15    like, the cords and all that kind of stuff like that,

16    that's the Fire Department's where they had to use

17    extraction to get -- to get him out.

18    Q.   Okay.  Do you see the passenger side

19    headlight?

20    A.   Right here?

21    Q.   Yes, sir.  What is that on the front?

22    A.   I don't know what that is.

23    Q.   Almost looks like wrapping paper or

24    something.  I just didn't know if you knew what it

25    was.

1      A.   No, I didn't know what it was.  I didn't

2  know if it came out and -- I don't know what it was.

3      Q.   Okay.  Just stood out to me so I thought

4  I'd ask you.

5           If you can go to the next photo, which is

6  81.

7      A.   Okay.

8      Q.   And again, can you tell me -- can you

9  identify specific debris that's in there.  Let me

10  point something out to you.

11      A.   Okay.

12      Q.   To the back of the Explorer it looks like a

13  couple of, like, wood pedestals or something like

14  that.  Do you know what those were?

15      A.   That looked like those little coffee

16  tables.

17      Q.   Okay.

18      A.   You know, like, they're hard to -- you

19  don't really see those type of coffee tables any

20  more.  Those are the old school round ones, yeah.  I

21  don't know if they was carrying them in the back but

22  that was theirs.

23      Q.   Okay.  Anything else?  Any other debris

24  that you can recall that you believe was in the

25  Explorer at the time of the crash?

1     A.   No, sir.

2          Q.   Okay.

3               It looks to me like there was extrication

4     equipment used on this Explorer?

5          A.   Yes, sir.

6          Q.   Did they cut the driver's side A-pillar?

7          A.   Yes, sir.

8          Q.   And they just completely cut it off?

9          A.   Yes, sir.

10         Q.   All right.  And did they cut part of the

11    driver's side B-pillar?  You see that big piece

12    that's standing up?

13         A.   Yes.

14         Q.   Maybe not the whole B-pillar but a portion

15    of it?

16         A.   Yeah.  Just cut it where they can take the

17    top off.

18              When I got there he was laying over

19    sideways.  So what they was trying to do was to try

20    to pick him up because he was a big, big guy.

21         Q.   Yeah.

22         A.   And they was trying to get enough people to

23    pick him up where they could slide the backboard up

24    under him.

25         Q.   Okay.

1        A.    And then just pull him out.

2        Q.    **Then I'm glad I'm asking this.  But by the**

3    **time you had got there, had they already cut the**

4    **driver's side A-pillar?**

5        A.    Yes, sir.  They already -- was already

6    cutting stuff.  And they was -- that's what that

7    noise was so loud.  They was -- they was cutting.

8    Then you had the fire trucks.  And then it was even

9    louder when the -- when you heard the helicopter.

10       Q.    **Okay.  I just want to focus on:  We've**

11   **already talked about the driver's side A-pillar and**

12   **the driver's side B-pillar.  Did somebody break out**

13   **the windshield or do you know if that was broken out**

14   **as part of the crash or do you not know one way or**

15   **the other?**

16       A.    I don't know --

17       Q.    **Okay.**

18       A.    -- about -- I assumed if they broke that

19   and broke and cut this, they pulled it back.  But,

20   you know, I -- I don't know.

21       Q.    **Okay.**

22       A.    What was -- I wasn't there when they was

23   cutting.

24       Q.    **Understood.**

25             **Did they cut the passenger side A-pillar?**

1        A.    Like I said previously, usually when

2    they're over there cutting and working, like I said,

3    they was cutting when I was there but I didn't go

4    over there.  When they're working I try to stay

5    clear.

6             I found out Ms. Cindy was my driver so that

7    was my main focus.

8        Q.    Understood.

9        A.    And there was a lot of people over there.

10   So I would have just been in the way.

11       Q.    Okay.

12       A.    Because I don't -- I don't know what -- how

13   to do what they're doing.

14       Q.    Okay.

15       A.    So I would have just been in the way so I

16   stay clear of it.

17       Q.    Did you walk up to the vehicle while

18   Mr. Ammerson was still in the Explorer?

19       A.    No, sir.  I seen him from a distance and I

20   could see what they was doing.

21       Q.    Okay.

22       A.    That's how I know they was trying to pick

23   him up to slide that up under there.  Because when I

24   was standing by Cindy, I was behind her and I was

25   trying to listen to her statements, smell any odor,

1    if there was any odor coming from her.

2         And, you know, I was also looking at the

3    scene.  And that's when I seen how they was trying to

4    get him out.

5         Q.   Okay.  But you're basically just seeing

6    this from the road.  It's not like you walked up --

7         A.   Yes.

8         Q.   Okay.  Was he still seated in the front

9    passenger seat?

10        A.   He was laid over.  Now, he was in the front

11   passenger seat but he was just laid over.  Like, I

12   don't even know if the seat belt was still on him or

13   not.  I know they had to cut it off of him.  But,

14   like, I just seen him laid over.

15        Q.   If we all want to try to figure out what

16   his position was at the point of rest, it sounds like

17   we need to talk to the person who was first to him.

18        A.   Yes, sir.

19        Q.   Is that fair?

20        A.   Yes, sir.

21        Q.   Okay.

22             All right.  Do you see, on the passenger

23   side, kind of near the cargo area, is that something

24   the Fire Department put there?  Is that, like, a --

25        A.   Are you talking about the red?  Or are you

Page 60

1    talking about --

2         Q.   I'm talking about that inflatable --

3         A.   Oh, that's to lift.  They put that up under

4    there trying to lift the -- the vehicle up a little

5    bit.

6         Q.   Okay.

7         A.   Yeah.

8         Q.   All right.  And then did I give you

9    Photo 82I may not have given you that.  Let me just

10   give you that one real quick.  There you go.

11        And again, we see some equipment from the

12   Fire Department and then some other things, other

13   debris that is in there.  Can you recognize anything

14   else that was in the vehicle at the time of the

15   crash?

16        A.   I mean, it looks like a pillow.  Just some

17   bottles and stuff.  But yeah.

18        Q.   In the previous photo, in 81, did you say

19   you found a -- was it a Bud Light can?

20        A.   Well, I don't know.  I can't remember.  I

21   don't really remember or recall.  It looks like one.

22   I may have looked into it to see if there was any

23   more.  I really -- I really can't tell you yes or no

24   if it is or not.

25        Q.   Okay.

1          Did you ever determine if Mr. Ammerson was

2     drinking?

3          A.   No, sir.  I didn't get close enough to him

4     to -- to smell anything on him.  I never got that

5     close.

6          Q.   Okay.

7          A.   Like I said, once I found out that she was

8     my driver, my focus was on her.

9          Q.   All right.  Then I'm going to hand you 71.

10    And we can see some flags.  Is that where the

11    Explorer went off the road, to the right or the east

12    side of the roadway?

13         A.   Yes, sir.  And like I said -- is this the

14    very first picture?

15         Q.   Yes, sir.

16         A.   Yeah.  And like I said earlier, there was a

17    vehicle, like, right here and it went back just a

18    little bit further.  But it wasn't nothing like --

19    pretty much how this one is, just -- just started

20    out.

21         Q.   Okay.  Do you have an estimate of how many

22    feet the right side tires of the Explorer were off

23    the road?

24         A.   No, sir.

25         Q.   Okay.  And the reason why the Explorer went

Page 62

1   off the road to the right where you have marked there

2   on Photo 71 is because Ms. Pollard was thinking of

3   other things?

4        A.   Yeah.  Before you get to this somewhat

5   straightaway right here, there is a curve that goes

6   back.  Like, she just came out of a curve to go into

7   the somewhat straightaway.

8            So I don't know -- I don't know if she came

9   out of the curve and, like, she told me other things

10  and that's how she dropped off.  I mean -- but yeah.

11  I don't know if that -- if you needed to know that.

12       Q.   I did.  Thank you.

13           But I'm just trying to understand what you

14  found in your investigation.  As part of your

15  investigation when she told you she was thinking of

16  other things and went off the road --

17       A.   Uh-huh.

18       Q.   -- is that this area right here?

19       A.   Yes, sir.  Yes.

20       Q.   Okay.  Understood.  Okay.

21           Did you, in your investigation, did you

22  find anything in the roadway that would have caused

23  her to leave the road at that point?

24       A.   No, sir.

25       Q.   All right.

Page 63

1           Then I'm going to hand you Photo 73.  And

2    is this where you mark the tire marks from the left

3    side or driver's side tires?

4        A.   Yeah, these are the left driver's side

5    tires.  This is where the yaw marks start.

6        Q.   Okay.  And here, from the point that we

7    looked at in Photo 71 when the tires are off the

8    road, was it your -- did your investigation conclude

9    that Ms. Pollard overcorrected to the left and that's

10   what caused the driver's side tires to cross double

11   yellow lines?

12       A.   Yes, sir.

13            MR. PARRISH:  Object to form.

14       Q.   (By Mr. Boorman) As part of your

15   investigation, did the Explorer travel into the --

16   what we see in Photo 73, the oncoming lane of traffic

17   because of that overcorrection to the left?

18       A.   Yes, sir.

19       Q.   All right.  And Ms. Pollard told you, as we

20   talked about before, that she admitted she did

21   overcorrect; is that true?

22       A.   Well, she told me she had other things on

23   her mind.  And then when she told me that, I asked

24   her, "That's when you overcorrected and lost

25   control?"  And she said yes.

1        Q.    Understood.

2              Then I'm going to show you Photo 74.  And

3    that's those same tire marks that we've been talking

4    about in Photo 73, correct?

5        A.    Yes, sir.

6        Q.    And why do these driver's side tire marks

7    get wider?

8        A.    The vehicle is starting to turn in a

9    clockwise rotation.

10       Q.    Okay.

11       A.    So the back end is coming around.

12       Q.    As part of your investigation, did you

13   conclude that this vehicle starts a clockwise

14   rotation because Ms. Pollard overcorrected to the

15   right?

16       A.    She over -- yeah, she ran off the road.

17   She overcorrected to the left.  And I'm not -- most

18   drivers, I'm not going to say all drivers, but most

19   drivers, once they run off the road they overcorrect.

20   And then it shoots -- most of the times the vehicles

21   shoot and they freak out and they overcorrect again.

22   And that's when usually the wreck starts to happen.

23       Q.    And that's exactly what happened here,

24   right?

25       A.    Yes.

1      Q.   Okay.  So is part of your investigation you

2   found an overcorrection to the left and then

3   overcorrection to the right and then a rollover?

4      A.   Yes, sir.

5      Q.   All right.

6           And where these tire marks stop in Photo 74

7   is where the Explorer becomes airborne?

8           MR. PARRISH:  Object to form.

9      A.   What's -- what's 75?

10      Q.   (By Mr. Boorman) Sure.

11           Well, let me just -- let me ask -- let me

12   ask you a different question.

13      A.   Okay.

14      Q.   Do you know why those tire marks stop in

15   74?

16      A.   Well, those are gouge marks.  They -- they

17   stop yawing and go to gouge marks, which means

18   sliding or -- or -- or usually rims digging into the

19   road.

20      Q.   Okay.

21      A.   Or sliding of the vehicle and then they can

22   be considered gouge marks.

23      Q.   And you may not have made a finding.  If

24   you didn't, just tell me that.  But at the end of

25   these tire marks that are in 74 --

1          A.    Uh-huh.

2          Q.    -- did you make a determination as to

3     whether that's the point that the Explorer tips up

4     and begins to roll or did you not make any

5     conclusion?

6          A.    I didn't make any conclusion --

7          Q.    Okay.

8          A.    -- just then.  But, I mean, I do see where

9     there's over -- overturn and then overturn and then

10    final rest.

11         Q.    Okay.  And I think I can short -- I

12    certainly don't want to ask you anything --

13         A.    Oh, yeah.

14         Q.    -- that you didn't, you know, spend the

15    time and reconstruct and that --

16         A.    Uh-huh.

17         Q.    -- sort of thing.  It's not my intention to

18    try to get you to do that for us today.

19         A.    Oh, yeah.

20         Q.    So let me ask you this question.  It might

21    shortcut a few questions.

22              Do you defer to experts who reconstruct

23    this accident as to what specific parts of the

24    Explorer impacted the ground after those tire marks

25    until the point of rest?

1          MR. PARRISH:  Object to form.

2          Rephrase.

3          MR. BOORMAN:  Sure.

4          MR. PARRISH:  Rephrase it.

5          MR. BOORMAN:  Yeah.

6     Q.   (By Mr. Boorman) Would you defer to other

7  accident --

8     A.   Like, a SCRT Team?

9     Q.   Just accident reconstruction --

10    A.   Okay.

11    Q.   -- experts who are working on the case?

12  Would you defer to them as to this specific vehicle

13  movements after those tire marks, from the end of

14  those tire marks to the point of rest?

15          MR. PARRISH:  Object to form.

16    A.   I mean, sometime -- I mean, I have done

17  that before where I just marked the scene and I'm

18  just sitting there looking at it.

19    Q.   (By Mr. Boorman) Right.

20    A.   Where you have the two vehicles and you

21  have vehicles going everywhere, you know, I need help

22  with someone that knows more stuff about it.  Usually

23  I just mark the scene with this one.  And I really

24  didn't -- I know this sounds terrible but I really

25  didn't put that much.

Page 68

1          I did put the effort into it.  That's my

2     job.  But I didn't go all the way into reconstruction

3     this wreck before -- this wreck because it's such a

4     simple wreck.

5          Q.   Right.  Let me ask -- I've done a bad job

6     of -- I understood what you're saying and let me ask,

7     hopefully, a better question.

8               Did you attempt to determine in this crash

9     what different parts of the vehicle impacted the road

10    and off the road between the end of the tire marks

11    that we see in 74 --

12         A.   Uh-huh.

13         Q.   -- Photo 74, all the way to the point of

14    rest, such that I could give you a vehicle and you

15    could say, "At this point this part touched.  At this

16    point the next part touched," did you attempt to do

17    that in your investigation?

18         A.   Well, I did to a certain degree.  Now, on

19    my Accident Report I -- I think I put too many cars

20    in there.  But I have a car in my -- I have a little

21    car in my patrol car that I use stuff like this for,

22    where I look at it and I try to draw it on how --

23    where I get the drawing right.

24         Q.   Okay.

25         A.   So I do that on all rollovers to make sure

Page 69

1      that this is like that.

2             So looking at it, it does look like it --

3      it flips right here.  But also there is gouge marks.

4      So I don't -- I interpreted that the flip initiated

5      right here and then went to there and then it flipped

6      over there.  That's how I initiated it on the

7      vehicle.

8             Q.   Okay.  You didn't reconstruct this

9      accident, did you?

10            A.   No, sir.  No.

11            Q.   Did you make any findings about speed?

12            A.   No, sir.

13            Q.   Did you make any findings about yaw rate?

14            A.   No, sir.

15            Q.   Did you make any findings about roll rate?

16            A.   No, sir.

17            Q.   Did you make any findings about yaw angle?

18            A.   No, sir.

19            Q.   Did you make any findings about the number

20     of rolls?

21            A.   No, sir.

22            Q.   Okay.  That's what --

23            A.   I put in there that it -- it turned over

24     three times.  Now, when I put in the report it

25     flipped three times, I'm not talking about whole

1    flips.  I'm talking about turn, turn, turn.

2         Q.   Okay.  But -- and again, I think I'm trying

3    to make sure that I'm not asking you to do more

4    than --

5         A.   Oh, no.

6         Q.   -- than you did.  I mean, in order to

7    determine how may rolls, you have to take a close

8    look at the scratches on the vehicle?

9         A.   Yes, sir.  Uh-huh.

10        Q.   And you have to take a close look at the

11   scratches at the scene?

12        A.   Yes, sir.

13        Q.   And it takes a lot of work to do that, even

14   after the day of the crash, hours and hours to

15   determine how the vehicle specifically moved.  You

16   didn't attempt to do any of that, did you?

17        A.   No, sir.

18        Q.   All right.  So if somebody asks you if you

19   have an opinion about how many times the vehicle

20   rolled, I'm assuming you would say, "I didn't

21   undertake that analysis;" is that fair?

22        A.   Yes, sir.

23        Q.   Okay.  Then I can skip a whole bunch.

24             Obviously you've marked and certainly can

25   see the path of travel.  But in terms of what

1      actually touched down where --

2            A.   No, sir.

3            Q.   -- you didn't attempt to undertake that

4      analysis?

5            A.   No, sir.

6            Q.   All right.  Fair enough.

7                 So let me just ask you a couple of things.

8      And let me start with Ms. Pollard.

9                 What did you determine in terms of her

10     injury?

11           A.   She was bleeding.  Now, I don't know how.

12     I know she needed to be sewn up.  Now, I can't

13     remember where her injury occurred.  I know I got on

14     here upper -- upper body.  But --

15           Q.   Where are you pointing at in your report?

16           A.   Right here.

17           Q.   Okay.  I gotcha.

18           A.   Upper body.  She was bleeding pretty bad

19     and needed stitches.  Now, I cannot remember where

20     she needed it because when I watched the video and I

21     was explaining the ticket and I told her that she

22     needed -- they was talking about she needed to go to

23     the hospital.  And I think I confirmed that.  I told

24     her that she needed to get stitched up.  But I don't

25     know where she was bleeding at.

Page 72

1      Q.   You don't know if it was on her head or on

2   her chest or on her arms?

3      A.   I just know the upper part.  If it was

4   head, we have a special port -- slot for head because

5   they said he had a head injury.  So on his -- his

6   head.

7      Q.   Okay.

8      A.   So usually the upper would be from the

9   torso area.

10      Q.   Okay.

11      A.   So I would assume it had to be arm but I

12   don't know.  I can't give you a hundred percent

13   answer where she was bleeding at.

14      Q.   Gotcha.

15           Was she taken from the scene for treatment?

16      A.   No, sir.  She refused medical treatment.

17   She said she would -- I think her friend said she was

18   going to take her.

19      Q.   Okay.

20      A.   Yeah.

21      Q.   Then let's switch to Mr. Ammerson.

22           What did you determine in your

23   investigation any observations about his injuries?

24      A.   I just -- I think they just told me he had

25   a head injury.  So I don't know the details.  I

1    didn't do a follow-up.

2           Like I said, I didn't go to Grady.

3    Grady -- I didn't call Grady.  Grady is a nightmare,

4    calling Grady to try and get some information.  So --

5    and he wasn't the driver.  So if something were to --

6    if he became deceased they would have notified us.

7        Q.   Okay.  Did you personally observe any

8    injuries to Mr. Ammerson?

9        A.   No, sir.  I never really got around him.  I

10   just seen him being loaded up.  And I don't even

11   think I even seen him go -- get into the helicopter.

12   I just seen the helicopter leave on my video.  I was

13   actually in my patrol car when the helicopter left.

14       Q.   Okay.

15            Having a rollover on the road like this and

16   the vehicle crashing into the road several times, is

17   that a severe crash?

18       A.   I mean, any --

19            MR. PARRISH:  Object to form.

20       A.   -- anytime that a rollover crash occurs, I

21   mean, it's -- it's -- I would say it's a -- pretty

22   much nearly a severe crash.

23       Q.   (By Mr. Boorman) Okay.

24            Do you know the outcome of the citation

25   that you gave to Ms. Pollard?

1          A.   I never heard anything.  Never got a

2     subpoena.  So she had to pay it.  And if she didn't

3     get a subpoena, then -- I mean, if she didn't pay it,

4     I would have got a subpoena to go to court.  Or if

5     she requested a court date or a jury trial I would

6     have got another subpoena.

7          **Q.   Okay.**

8               **The weather on this day was clear at the**

9     **time of the crash?**

10         A.   It was -- at the time of the crash it was

11    clear.  Now, it was cloudy but it was clear, like,

12    there was no road conditions.

13         **Q.   Okay.**

14         A.   Now, when I got there, you could see it

15    started raining bits and pieces of when I was there.

16    And then after that, it rained the whole rest of the

17    day.

18         **Q.   Okay.  But at the time of the crash the**

19    **road, the surface of the road was dry?**

20         A.   Yes, sir.

21         **Q.   And it was -- the light condition was**

22    **daylight?**

23         A.   Yes, sir.

24         **Q.   Did you rule out any roadway factors**

25    **contributing to this crash?**

1          A.   There was no contributing factors.

2          Q.   **All right.  And the road character at this**

3     **area, is it straight and level?**

4          A.   It was straight coming into it.  Let me see

5     what I put on here.

6               I have straight and level here.

7          Q.   **Okay.**

8          A.   There's really -- I mean, that's what I put

9     on there.  But there's really no straight and level

10    road here.  One of them has a grade.  But --

11         Q.   **Okay.**

12         A.   Yeah.

13         Q.   **Let me take a look at something.**

14              **Basically you ruled out the environment**

15    **having anything to do with this crash; is that**

16    **correct?**

17         A.   Yes, sir.

18         Q.   **And you ruled out the road having anything**

19    **to do with this crash; is that also true?**

20         A.   Yes, sir.

21         Q.   **All right.**

22              **For contributing circumstances for this**

23    **vehicle, what did you determine?**

24         A.   For what now?

25         Q.   **Under the vehicle, the Explorer, what was**

1    your finding about contributing circumstances for

2    this vehicle?

3         A.   Where do you see that at on the report?

4    Oh, contributing circumstances.  That the area of

5    impact was on the top.

6         Q.   Oh, I'm sorry.  I'm looking at -- do you

7    see the area that -- the section of the report that

8    says "Contributing circumstances," one, open paren,

9    (this vehicle), close paren?  It's right above --

10             MR. PARRISH:  Object to the form.

11        A.   It just says "None."

12        Q.   (By Mr. Boorman) Okay.

13        A.   Yeah.

14        Q.   And explain what that means.

15        A.   I would have to look at the drop-down box.

16   But I'm sure -- I mean, it's, like -- okay.  So the

17   contributing circumstances, the most harmful event,

18   the first -- it's been a while since I looked at one

19   of these.

20             The first sequence is the noncollision,

21   which is the rollover.  So that means that's not

22   another vehicle involved.  The most harmful event was

23   the rollover.  And the contributing circumstances, I

24   guess it was "none," meaning it was a one-vehicle

25   accident.

1          Q.    Okay.

2          A.    But like I said, I would have to -- I hate

3     that we don't have this report where I could bring

4     the computer in and just show you the drop-down box.

5          Q.    Okay.

6                You investigated this crash on behalf of

7     the State of Georgia; is that correct?

8          A.    Yes, sir.

9          Q.    And is it true that what we've marked as

10    Exhibit A is an official copy of your findings of

11    your investigation?

12         A.    Yes, sir.

13         Q.    All right.  With respect to the findings

14    related to Ms. Pollard, what did you find with

15    respect to whether there were any driver vision

16    obstructions?

17         A.    There was no -- vision was not obscured,

18    meaning, like, there was nothing blocking the

19    roadway.  There was no sun coming into her eyes.

20    There was no bushes or trees causing her to not be

21    able to see.

22         Q.    Okay.  And in terms of driver actions at

23    the time of the crash, based upon your investigation

24    what did you find?

25         A.    No contributing action.  Is that right?

1    The driver's action at the time of the crash.  Oh, I

2    looked at three.  One, ran off roadway.

3         Q.   Okay.

4         A.   And two, failed to keep proper lane.

5         Q.   Okay.

6              Let me take a look at one of the -- sorry.

7    I have to dig around for this.

8              If you can look at Photo 79 and the

9    driver's side rear tire.  Is that photo good enough

10   that you can look at the tread of that tire?

11        A.   I mean, compared to the other tires, it

12   looks more bald on it.

13        Q.   Okay.  And I'm going to hand you what's

14   been marked as Exhibit 9.

15             (Defendant's Exhibit 9, Ga. Code Ann.,

16             40-8-74, Effective July 1, 2011, marked for

17             identification.)

18        Q.   (By Mr. Boorman) Which is a code section

19   you may be familiar with or you may not be.  It's

20   Georgia Code 40-8-74.  And are you familiar with that

21   code section that says "Tires shall not have less

22   than 2/32nds of an inch of tread"?  Are you familiar

23   with that?

24        A.   I'm familiar with it.  I never wrote a

25   citation on it but I'm familiar with it.

1        Q.   All right.  You may know, you may not know.

2   Do you know if that tire that we see, the back side

3   driver's tire had less than 2/32nds?

4        A.   I didn't -- I didn't pay -- I didn't do --

5   I didn't investigate that.

6        Q.   Understood.

7            If a tire does have less than that, it is a

8   violation of this code section, correct?

9        A.   Yes, sir.

10       Q.   All right.

11           And after your investigation of this crash,

12   including talking to Ms. Pollard, looking at the

13   scene, marking the scene evidence, was it your

14   finding that she was the sole cause of this crash?

15       A.   Yes, sir.

16           MR. PARRISH:  Object to form.

17           MR. BOORMAN:  Okay.  Thank you very much

18       for your time, Trooper.  I may have some

19       follow-ups --

20           THE WITNESS:  Okay.

21           MR. BOORMAN:  But I believe the other

22       attorney may have some questions.  I'll try to

23       clean up my junk because I've made quite a mess.

24   EXAMINATION

25   BY MR. PARRISH:

Page 80

1      Q.   I'm just going to have a few questions for

2  you.

3           Based on the report that you filled out,

4  what was it, about 11 minutes from the time of the

5  wreck until you arrived on the scene?

6      A.   Ten or 11 minutes, yes, sir.

7      Q.   Okay.

8      A.   Yeah, 11 minutes.

9      Q.   All right.

10          Did you personally observe them cutting the

11 pillars of the vehicle or any parts of the vehicle

12 such that you can tell us with any certainty exactly

13 what was cut versus what wasn't cut as you sit here

14 today?

15     A.   No, sir.  Like I told him, they was cutting

16 when I got there.  But I didn't -- I feel like I

17 would be in the way.  I do not go near the scene when

18 they're doing that.

19     Q.   All right.  So you don't know exactly what

20 was cut on the car?

21     A.   No, sir.

22     Q.   Is there any evidence that alcohol or drugs

23 contributed in any way to the wreck or Mr. Ammerson's

24 injuries?

25     A.   No, sir.

1      Q.   Based on the investigation that you did at

2  the time and the markings that you observed on the

3  roadway and off the roadway, I think you told us that

4  at the time you determined that it was three quarter

5  turns?

6           MR. BOORMAN:  I'm sorry.  Object to the

7           form and foundation.

8           I just need to state that for the record

9           but please answer.

10     A.   Yes, I believe it was three flips.  Not --

11  not full flips, just three flips.

12     Q.   (By Mr. Parrish) So, like, quarter turns?

13     A.   Yes, sir.

14     Q.   Okay.  So if the vehicle is upright, one

15  turn would be over on to the side, two turns would be

16  over on to the roof, another turn would be over on to

17  the other side.  So first turn would be on to the,

18  let's say, the driver's side?

19     A.   Side.

20          Can I use this?

21          MR. BOORMAN:  Absolutely.  Yeah.

22     A.   Yeah.  So I had her turning.

23     Q.   (By Mr. Parrish) Oversteering?  The vehicle

24  is oversteering?

25     A.   Yep.  And then -- and then --

1   Q. Okay.

2    MR. BOORMAN:  And object to the form.

3    But go ahead.

4    THE WITNESS:  Okay.

5   Q. (By Mr. Parrish) So the driver's side hits

6 first, then the roof and then the passenger side?

7   A. Yes.

8   Q. Comes to rest on the passenger side?

9   A. Yes, sir.

10   Q. All right.

11   A. That's how I -- I believe it happened.

12   Q. All right.

13    If we look at Photo 74.  And there are two

14 dots.  There's a line of two dots there.  Are those

15 markings for the left side tires?  So the driver's

16 side tires?

17   A. Number 74, yeah.  Is there 73?

18    Yes, that's the left side.  That's the left

19 side driver's.

20   Q. Okay.  And then just a little bit beyond

21 that, there are -- I think you described those as

22 gouge marks?

23   A. Yes, sir.

24   Q. All right.  And is that likely from the

25 wheels of the vehicle?

1      A.   Yes, sir.

2           MR. BOORMAN:  Object to the form.

3      Speculation.

4           But go ahead.

5      A.   Yeah.  Usually, like I was telling them,

6  gouge marks comes from the tires of the rims or when

7  it turns and scrapes on to the roadway.

8      **Q.   (By Mr. Parrish) Okay.  And in your**

9  **opinion, where those markings are -- and there are**

10 **two orange markings adjacent to the gouge marks?**

11     A.   Yes, sir.

12     **Q.   Is that where the vehicle started to roll?**

13     A.   Looking at it like this, I believe it does

14 roll right here just because the other day when I was

15 looking at it I didn't realize how big a gap this

16 was.  Usually when you have that big of a gap that's

17 when it starts to roll.

18          Sometimes when the vehicle turns completely

19 like this and the tires before it -- you know how the

20 tires go against the course causes gouges and then it

21 flips.  As big as a space that is, I think it's

22 overturning there and that's the sliding.

23     **Q.   Okay.  All right.**

24          **And you said that you looked at it the**

25 **other day.  Did you look at these photos sometime in**

1    the past week?

2         A.   Yes, sir.

3         Q.   Okay.   Where did you do that at?

4         A.   Here.

5         Q.   Okay.   And "here," is this the building,

6    999 Peachtree Street, Northeast?

7         A.   Yes.

8         Q.   Okay.   And whose office were you in when

9    you looked at them?

10        A.   Downstairs in the, I guess, the main --

11        Q.   Was it the law firm of Huff Powell &

12   Bailey?

13        A.   Yes, sir.

14        Q.   Counsel for Ford Motor Company?

15        A.   Yes, sir.

16        Q.   Okay.   I think you mentioned to me when we

17   spoke that there's some point on here where you

18   believe that two -- two wheels were down and in

19   contact with the pavement?

20        A.   Off the road?

21        Q.   Sure.   Yeah.   When it was rolling, when the

22   vehicle was sliding?

23        A.   Oh, that's what I was explaining.   Gouge

24   marks.

25        Q.   Uh-huh.

1      A.   Yeah.  But that's a big space for it to

2   have nothing there.  So I truly -- that's where it

3   overturned and that's where it was sliding causing

4   the marks.

5      Q.   Okay.  So right where the gouge marks

6   are --

7      A.   Yes, sir.

8      Q.   -- that's where it was rolling?

9      A.   Yes, sir.

10     Q.   I know that you didn't determine speed with

11  precision.  But the speed that you believe she was

12  traveling at would not have warranted a speeding

13  ticket on this road?

14     A.   No -- no, sir.  And I didn't -- I didn't do

15  speed, just like I told y'all earlier.  But I don't

16  believe she was going fast enough for me, if I would

17  have seen her coming, to write her a citation.

18     Q.   Okay.

19          Now, after you spoke with Ford Motor

20  Company or their representatives last week, did you

21  consult with or speak with someone on the SCRT Team

22  about the photographic evidence?

23     A.   Yes, sir.

24     Q.   Okay.  What did you speak with the SCRT

25  Team member about?

1          A.   Because I -- I knew this was two tires.

2     This is the front tire and the back tire and the back

3     tires coming.  That's Page 73.

4          Q.   Okay.

5          A.   And just for validation, I took a picture

6     and sent it to a SCRT guy and they confirmed that it

7     was two tires.

8          Q.   Depicted in 73?

9          A.   In Picture 73.

10          Q.   Okay.  And did Ford's representatives

11     convey to you that they believed it was only one?

12          A.   No, sir.

13          Q.   Okay.  Did they suggest that?

14          A.   No, sir.

15          Q.   Okay.

16               At the time of the collision you did not

17     measure the tread depth, did you?

18          A.   No, sir.

19          Q.   Did anyone suggest that the tread depth of

20     the tires played a role in this?

21          A.   No, sir.

22          Q.   And if they had, if the tires or the

23     condition of the tires played a role in this

24     collision, is that something that you probably would

25     have picked up on during your investigation?

1        A.   I mean, I would have noted it in the

2   Accident Report.  I just didn't look at the tires.

3   And even if I did look at the tires, it's nothing

4   that I would have wrote a citation for.

5        **Q.   And the pavement was dry at the time?**

6        A.   At the time of the accident, yes, sir.

7        **Q.   And do you know a tire that's -- has less**

8   **tread on it and more contact patch, does that have**

9   **more or less traction on dry pavement?**

10       A.   The tire with less traction?

11       **Q.   Less tread.**

12       A.   Less tread on dry pavement?

13       **Q.   Yeah.  And more contact patch.  So more**

14  **rubber is contacting the pavement.**

15       A.   So have more -- what was --

16       **Q.   My question is, do you know whether that**

17  **would have more or less traction?**

18       A.   I don't know.  I don't want to say what I

19  don't know.

20       **Q.   Do you agree that there's no one definition**

21  **of overcorrection?**

22       A.   No, sir.  I mean, there's no --

23       **Q.   Do you agree with that, that there's no one**

24  **definition --**

25       A.   Oh, yes.

Page 88

1        Q.    -- of overcorrection.

2             MR. BOORMAN:  Objection to the form.

3        Vague.

4        Q.    (By Mr. Parrish) It's a subjective term,

5   isn't it?

6        A.    Yes.

7             MR. BOORMAN:  Same objection.

8        Q.    (By Mr. Parrish) Do you have any reason to

9   believe that Ms. Pollard, Cindy Pollard or now Cindy

10  Cosper, do you have any reason to believe that she

11  turned the wheel any more than she thought she needed

12  to at any given time?

13            MR. BOORMAN:  Hold on a second.

14            Object to the form.  Calls for speculation

15       of another person.

16            But answer if you can.

17       A.    I mean, I can't -- I can't -- I mean, I

18  really -- I can't answer that question because I'm

19  not driving with her or --

20       Q.    (By Mr. Parrish) Well, I guess just the

21  question is, is there any reason that you would

22  believe that she turned the wheel more than she

23  thought was necessary at the time?

24            MR. BOORMAN:  Same objection.

25       A.    There's -- a lot of it depends on their

1    driving skills.  I mean, some people can run off the

2    road and get it back under control.  Some people

3    don't have -- they -- they freak out more.  And

4    that's -- and they overcorrect and they overcorrect

5    too much and that causes the vehicle to lose control.

6         Q.   (By Mr. Parrish) Well, I guess what I'm

7    asking is, do you have any evidence that you can

8    point to that she turned the wheel more than she

9    thought was necessary?

10        A.   No, sir.

11             MR. BOORMAN:  Same objection.

12        Q.   (By Mr. Parrish) And different vehicles

13   have different handling characteristics; that's true

14   too, isn't it?

15        A.   Yes, sir.

16        Q.   You're not an expert in vehicle dynamics,

17   that's true?

18        A.   No, sir.

19        Q.   You don't know how much the wheel was

20   turned at any one given time?

21        A.   No, sir.

22        Q.   And there's no way that you can calculate

23   the degree that the wheel was turned in at any one

24   given time?

25        A.   No, sir.

1      Q.    Would you defer to engineers who can make

2  those calculations?

3      A.    Yes, sir.  They have a black box in most

4  vehicles.  I don't know if this one has it.  But it

5  tells you pretty much everything you didn't know

6  about what -- that's how a lot of the SCRT Teams,

7  they get that black box just to confirm everything

8  they -- they seen on the road.

9          But I don't know if this one had it.  And I

10 didn't -- and I didn't pull it.  So -- and I didn't

11 get a SCRT Team to pull it.  So --

12     Q.    If Ms. Cosper wants -- in the emergency

13 situation, if she turned the wheel the amount that

14 she thought was necessary, you wouldn't blame her for

15 that, would you.

16         MR. BOORMAN:  Same objection.  Speculation

17     and vague.

18     A.    Regardless, it would still be her fault in

19 the accident because she lost control regardless of

20 how much she turned the wheel.

21     Q.    (By Mr. Parrish) Understood.

22         But you wouldn't fault her for turning it

23 and trying to correct an emergency situation if she

24 did the best she could and turned it what she thought

25 was the appropriate amount?

1           MR. BOORMAN:  Same objection.  And he just

2       answered that question.

3       A.   I mean --

4           MR. BOORMAN:  You don't have to give a

5       different answer.

6       A.   I mean, that's -- I mean, it's the same.

7   So, I mean, I -- I don't -- I don't know what answer

8   you want me -- I don't -- she -- she lost control

9   regardless if she overcorrected or not.  She ran off

10  the road and then she overcorrected again.

11          So I don't know how you can say it's not

12  fault of her when it's her fault.

13      Q.   Okay.  And that's simply because of the

14  fact that she went on to the other side of the road

15  and the vehicle overturned, right?

16      A.   Yes.  She couldn't maintain her lane and

17  then she overcorrect and that's when she lost

18  control.

19      Q.   Right.  But all you know in terms of the

20  sequence, you know, and the amount that she turned

21  the wheel --

22      A.   Yeah, I don't -- I don't know --

23      Q.   What she's thinking at the time?

24      A.   I don't know.

25      Q.   Let me start over.

1          In terms of the sequence of events and the

2     way that she turned the wheel, how much she turned

3     the wheel, the facts that you know are that there was

4     an emergency situation, there was a turning maneuver

5     during the emergency situation and she lost control

6     of the vehicle; is that true?

7          MR. BOORMAN:  Object to the form.

8       Misstates prior testimony.

9          But answer if you can.

10     A.   I mean -- I mean, it's true.  I mean, she

11     lost control of the vehicle by her vehicle maneuver.

12     Q.   (By Mr. Parrish) Okay.

13     A.   So, I mean, I don't -- I don't know how you

14     want me to answer the question.  I mean, she, like I

15     said, she ran off the road.  She tried to

16     overcorrect.  She went too far.  She overcorrected

17     again.  That's when she lost more control.

18     Q.   And when you say "overcorrected," what I'm

19     getting at is you don't know how much --

20     A.   I don't know the amount she turned the

21     wheel, no, sir.

22     Q.   Okay.  And so there was an emergency

23     situation.  There was a turning maneuver within the

24     emergency situation.  And what do we call that?

25     You're saying overcorrecting.  Is that called

1    oversteering when the vehicle turns?

2         A.   You can call it that.

3              MR. BOORMAN:  Hold on a second.  I'm sorry.

4              Objection.  Narrative.  Complex question.

5         Misstates prior testimony.

6              But answer if you can.

7         Q.   (By Mr. Parrish) What's it called when the

8    vehicle's back end slides out in a turn?  In other

9    words, let's say it's a right turn and the vehicle --

10   the front wheels are going to the right and the back

11   wheels are sliding out to the left.  Is that called

12   oversteering?

13        A.   Well, I mean, it's rotation.  It's a

14   clockwise rotation in the -- in the vehicle.

15        Q.   (By Mr. Parrish) All right.

16        A.   Yeah.

17        Q.   And so here in this collision, this wreck,

18   the vehicle oversteered, right, when it was coming

19   back from the other side of the road when that

20   clockwise rotation -- would that you call

21   oversteering?

22        A.   That's a yaw mark where they're losing

23   control in the vehicle.

24        Q.   Okay.  Are you not familiar with the term

25   "oversteering"?

1        A.   I mean, we call it overcorrecting.  It's

2    where they overcorrected and it caused a yaw mark.

3    That's how we write the reports up.

4        Q.   Okay.

5        A.   And then usually that's when the wrecks

6    happen.

7        Q.   Okay.  So you do not use the term --

8        A.   I don't use "oversteer."  I always use

9    "overcorrected."

10       Q.   Okay.  So you would never put in a report

11   "oversteering"?

12       A.   No, sir.  No, sir.

13       Q.   Okay.  You would always use

14   "overcorrecting"?

15       A.   Yes, sir.

16       Q.   Okay.

17       A.   And every one of my reports in a similar

18   wreck like this I always use "overcorrected."  And

19   then I always put what the driver states.

20       Q.   Okay.  Have you ever heard the expression

21   "understeering, oversteering"?

22       A.   I've heard that, yes.  But I've just always

23   used "overcorrected."

24       Q.   Okay.

25       A.   That's just how I was trained.

1          Q.    You cannot say whether the vehicle played a

2     role or what role it played in the rollover?

3          A.    No, sir.

4                MR. BOORMAN:  Object to the form.

5                But go ahead and answer.

6          A.    No, sir.

7          Q.    (By Mr. Parrish) All right.  And that's a

8     question for engineers, correct?

9          A.    Yeah.  I don't -- yeah.  I don't have no

10    information.  I'm not certified for that.

11         Q.    Okay.  All right.

12               MR. PARRISH:  I don't think I have anything

13         else.

14               MR. BOORMAN:  Sir, you have the opportunity

15         to read and sign this deposition to make any

16         typographical corrections, spelling corrections,

17         those sort of things.  Or you can waive

18         signature and just trust the court reporter got

19         everything written down correctly.

20               Do you have a preference on those?

21               THE WITNESS:  No.  I mean, everything is --

22         everything is -- I believe is correct on here.

23               MR. BOORMAN:  Okay.  So you're going to

24         waive signature.

25               THE WITNESS:  Yes.

1           MR. BOORMAN:  All right.  Just give me two

2       minutes.  We're going to take a break.

3           THE WITNESS:  Okay.

4           MR. BOORMAN:  And then I'll come right

5       back.  But I think we're -- we are timing up

6       about perfect.  You've got five minutes left.

7           (WHEREUPON, a recess was taken.)

8   EXAMINATION

9   BY MR. BOORMAN:

10      Q.   All right.  As a result of your work in

11  this case, including your interview of Ms. Pollard,

12  your documenting all the scene evidence, your

13  finding, based upon your investigation, is that this

14  rollover occurred because Ms. Pollard was thinking of

15  other things, failed to maintain her lane and

16  overcorrected this Explorer twice; is that true?

17          MR. PARRISH:  Object to form.

18      A.   Yes.

19          MR. BOORMAN:  Okay.  All right.  That's all

20      I had.

21          Anything else or --

22          MR. PARRISH:  No.

23          MR. BOORMAN:  All right.  All right.

24      Deposition is concluded.

25          (WHEREUPON, the deposition was concluded at

1          12:02 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 98

1                    C E R T I F I C A T E

2    STATE OF GEORGIA   )

3                        ) ss.:

4    FULTON COUNTY      )

5

6        I,  Robin Ferrill, Certified Court Reporter

7    within the State of Georgia, do hereby certify:

8            That TROOPER JOEY WILSON, the witness whose

9    deposition is hereinbefore set forth, was duly sworn

10   by me and that such deposition is a true record of

11   the testimony given by such witness.

12           I further certify that I am not related to

13   any of the parties to this action by blood or

14   marriage; and that I am in no way interested in the

15   outcome of this matter.

16           IN WITNESS WHEREOF, I have hereunto set

17   my hand this 11th day of November, 2019.

18

19

20           ROBIN K. FERRILL, RPR

21

22

23

24

25

**[& - allowed]**                                                        Page 1

| & | | |
| --- | --- | --- |

**&**   84:11

| 0 |
| --- |

**00189**   1:6
**05**   22:5 35:21
**06**   25:25
**09**   26:1,3 27:1

| 1 |
| --- |

**1**   3:10,23 6:16,19
  22:19 78:16
**10**   3:16 9:4 31:7
**100**   2:17
**10:10**   1:14
**11**   80:4,6,8
**11th**   98:17
**12**   3:18 27:4
**12:02**   97:1
**13637**   98:19
**15**   3:19,20
**16**   27:4,9 31:3
**18**   27:9,12
**18th**   22:11
**1936**   1:20
**1:30**   39:9
**1:50**   39:18
**1:57**   39:15 40:19
**1st**   22:6

| 2 |
| --- |

**2**   3:11 7:3,7 8:21
  10:7 22:19
**2,000**   28:21 29:1,8
**2/32nds**   78:22
  79:3
**20**   14:18 32:25
**2000**   34:24 36:1
  38:16
**2002**   21:10,15
**2006**   9:1 22:7,11
  23:11,12 25:7

**2007**   23:17
**2008**   23:17
**2009**   9:4
**2011**   3:23 78:16
**2012**   26:11 27:1
**2014**   24:7 26:12
**2015**   37:2
**2016**   14:18 26:24
  35:15
**2017**   9:7
**2018**   9:7 26:24
  52:2
**2019**   1:13 3:4 4:3
  98:17
**21**   22:4
**2250**   2:3
**25**   15:11
**2500**   29:1,8,24
**25th**   11:11,12 37:2
**28**   1:17
**29**   1:13 3:4 4:3
**2:18**   1:6

| 3 |
| --- |

**3**   3:12 7:16,19
  22:19 23:2 24:25
  25:3
**30**   13:6,7,9 40:22
  52:14
**300**   28:22
**30309-4514**   2:11
**30326-2900**   2:4
**32**   45:14
**33**   45:16
**35**   37:21
**36**   9:24
**3:34**   37:5
**3:45**   37:11

| 4 |
| --- |

**4**   3:6,14 7:24 8:3

**40-8-74**   3:22 78:16
  78:20
**404.891.0141**   2:5
**404.892.4022**   2:11
**4705**   2:16
**4:58**   37:13

| 5 |
| --- |

**5**   3:16 10:25 11:3
**500**   28:20
**52**   8:8,8 9:12,13
**5:10**   41:22 42:3

| 6 |
| --- |

**6**   3:10,18 12:3,7,7
  12:21
**600**   28:25

| 7 |
| --- |

**7**   3:11,12,14,19
  15:2,4
**71**   61:9 62:2 63:7
**72116**   2:17
**73**   63:1,16 64:4
  82:17 86:3,8,9
**74**   64:2 65:6,15,25
  68:11,13 82:13,17
**75**   65:9
**78**   3:22
**79**   3:7 53:22 78:8

| 8 |
| --- |

**8**   3:20 15:23 16:2
  16:4 17:10
**80**   54:3
**81**   53:23 55:6
  60:18
**82i**   60:9

| 9 |
| --- |

**9**   3:22 78:14,15
**94**   35:23
**945**   2:4

**950**   2:10
**96**   3:6
**999**   1:16 2:10 84:6

| a |
| --- |

**a.m.**   1:14
**able**   16:6 77:21
**absolutely**   81:21
**accident**   8:18
  11:18,19 23:15
  24:15,21 28:11
  33:7 44:12,24
  46:10,11 66:23
  67:7,9 68:19 69:9
  76:25 87:2,6
  90:19
**accidents**   11:15
  23:18 29:11,11
**accurate**   15:19
**accurately**   12:14
**accusation**   3:17
  11:1
**action**   1:5 77:25
  78:1 98:13
**actions**   77:22
**actual**   13:24 14:3
  15:8 16:15 48:17
**additional**   6:23
  49:8
**adjacent**   83:10
**admitted**   63:20
**agencies**   25:20
**ago**   50:4
**agree**   87:20,23
**agreement**   4:6
**ahead**   82:3 83:4
  95:5
**airborne**   65:7
**alco**   33:24 34:9
**alcohol**   80:22
**allowed**   49:11

**allyn** 2:9
**alternate** 11:23
**ammerson** 3:15
7:25 8:3 12:9 39:5
43:22 46:6 47:25
48:14 50:11 52:23
58:18 61:1 72:21
73:8
**ammerson's** 80:23
**amount** 90:13,25
91:20 92:20
**analysis** 70:21
71:4
**angle** 69:17
**ann** 3:22 78:15
**answer** 4:15 6:1
72:13 81:9 88:16
88:18 91:5,7 92:9
92:14 93:6 95:5
**answered** 91:2
**anybody** 11:16
13:7 18:19 31:12
50:7 51:23 52:18
**anybody's** 50:8
**anyplace** 16:3
**anytime** 73:20
**apiece** 28:22
**apologize** 20:22
53:10
**apparently** 16:19
**appearances** 2:1
**approaching**
40:23
**appropriate** 90:25
**approximately**
37:5
**april** 26:1,3
**area** 27:23 37:25
59:23 62:18 72:9
75:3 76:4,7

**arkansas** 2:17
**arm** 72:11
**arms** 72:2
**arrive** 37:10
**arrived** 80:5
**asked** 41:11,12,16
41:18 52:14 63:23
**asking** 14:7 57:2
70:3 89:7
**asks** 70:18
**assist** 25:19
**associates** 2:16
**assume** 72:11
**assumed** 57:18
**assuming** 70:20
**atlanta** 1:18 2:4,11
45:6,11
**attach** 15:8
**attached** 3:24
**attempt** 24:20
68:8,16 70:16
71:3
**attorney** 79:22
**audible** 6:1
**audio** 41:1 51:2
**august** 22:11
25:25
**auto** 34:12
**avenue** 2:16
**aware** 12:17 20:12
20:13 33:21 51:3

**b**

**b** 1:20 56:11,14
57:12
**back** 9:6 20:8 39:8
44:4 46:2,10 47:7
47:11,22,23 49:14
49:22,24 53:14
55:12,21 57:19
61:17 62:6 64:11
79:2 86:2,2 89:2

93:8,10,19 96:5
**backboard** 56:23
**backed** 47:8
**background** 6:11
20:25 21:6 23:19
42:6
**bad** 68:5 71:18
**bagging** 34:19
**bags** 54:7
**bailey** 2:10 84:12
**bald** 78:12
**based** 44:25 77:23
80:3 81:1 96:13
**basically** 30:10
39:10 41:23 59:5
75:14
**begins** 66:4
**behalf** 2:2,8,15
50:11 77:6
**believe** 7:20 32:17
38:23 54:9 55:24
79:21 81:10 82:11
83:13 84:18 85:11
85:16 88:9,10,22
95:22
**believed** 86:11
**belt** 43:6,7 59:12
**best** 7:14 14:10
16:19 28:18,20
29:7 90:24
**better** 25:6 68:7
**beyond** 82:20
**big** 56:11,20,20
83:15,16,21 85:1
**birth** 9:8
**bit** 6:12 14:1 17:21
25:5 41:2,5 47:6
47:11 60:5 61:18
82:20
**bits** 74:15

**black** 90:3,7
**blackburn** 2:9
**blame** 90:14
**bleeding** 71:11,18
71:25 72:13
**blocking** 77:18
**blood** 98:13
**blow** 33:24 34:9
**body** 71:14,18
**boorman** 2:8 3:6
4:4,17,21,23 6:18
7:6,19 8:2 11:3
12:5 15:6 16:1
32:4 40:21 42:1
49:17 63:14 65:10
67:3,5,6,19 73:23
76:12 78:18 79:17
79:21 81:6,21
82:2 83:2 88:2,7
88:13,24 89:11
90:16 91:1,4 92:7
93:3 95:4,14,23
96:1,4,9,19,23
**bottles** 54:7 60:17
**bottom** 12:8,9
53:22
**box** 8:17 9:10 49:2
76:15 77:4 90:3,7
**brag** 28:18
**break** 5:12,15
36:20 53:17 57:12
96:2
**breath** 27:17,17
**bremen** 41:9
**brief** 21:6
**bring** 51:13 77:3
**bringing** 27:21
**brings** 22:5
**broke** 31:9 57:18
57:19

**broken**  57:13
**brown**  2:9
**bud**  54:10 60:19
**building**  84:5
**bunch**  19:15,17,22
  70:23
**bushes**  77:20
**busiest**  25:12
**buycrash**  16:6

**c**

**c**  26:19 27:14 98:1
  98:1
**cabin**  35:19
**calculate**  89:22
**calculations**  90:2
**call**  5:13 42:15
  46:11 48:5 51:17
  73:3 92:24 93:2
  93:20 94:1
**called**  4:10 14:11
  21:22 48:1 92:25
  93:7,11
**calling**  14:14 73:4
**calls**  88:14
**camera**  12:23,25
  13:1,10 14:4,5,15
**capitol**  26:23
  27:10 52:1
**car**  3:19 14:24
  15:3,4,18 17:17
  20:8 31:17 34:21
  39:11,18 43:5
  45:12 46:1 68:20
  68:21,21 73:13
  80:20
**card**  46:1
**cargo**  59:23
**carrying**  55:21
**cars**  25:17 30:8
  32:1 68:19

**cartersville**  26:13
  27:8 47:2,3
**case**  5:4 6:21
  11:23 12:10 16:20
  24:18 32:13 45:10
  48:12 67:11 96:11
**cases**  33:7
**cause**  79:14
**caused**  62:22
  63:10 94:2
**causes**  83:20 89:5
**causing**  77:20 85:3
**ccr**  1:20
**cedartown**  26:4,6
  26:10 27:2
**center**  45:11
**ceo**  21:22
**certain**  20:3 22:23
  32:11 68:18
**certainly**  66:12
  70:24
**certainty**  80:12
**certified**  95:10
  98:6
**certify**  27:16 98:7
  98:12
**chance**  12:13
  36:10
**changed**  9:19,23
**changing**  48:23
**character**  75:2
**characteristics**
  89:13
**check**  37:9 49:2
**checkups**  51:16
**chest**  72:2
**christmas**  37:2
  42:13
**cindy**  1:4 3:13
  7:17 11:12 38:18
  38:19,23 46:7

58:6,24 88:9,9
**circumstances**
  75:22 76:1,4,8,17
  76:23
**citation**  11:4,10,13
  11:17,19 46:12,13
  73:24 78:25 85:17
  87:4
**citations**  3:16 11:1
**civil**  1:5
**class**  23:20 24:25
**classes**  22:23,23
  23:23
**classified**  25:4
**clayton**  27:23
**clean**  79:23
**clear**  58:5,16 74:8
  74:11,11
**click**  9:9
**clip**  42:2 43:9
**clockwise**  64:9,13
  93:14,20
**close**  61:3,5 70:7
  70:10 76:9
**closed**  26:10
**clothes**  54:7
**cloudy**  74:11
**club**  1:15
**code**  3:22 7:15,20
  8:6,11 10:4 78:15
  78:18,20,21 79:8
**codes**  7:14,21 9:3
  9:9,10 16:17
**coffee**  55:15,19
**collision**  86:16,24
  93:17
**color**  3:18 12:3
**coma**  48:22
**come**  8:12 10:10
  44:20 48:20,25
  96:4

**comes**  13:20 19:10
  82:8 83:6
**coming**  33:4 45:4
  48:9 59:1 64:11
  75:4 77:19 85:17
  86:3 93:18
**command**  26:19
  27:14
**comment**  39:13
**communicate**  51:9
**communications**
  21:22,23
**company**  1:7
  84:14 85:20
**compared**  78:11
**complete**  24:5
  28:4
**completed**  18:23
  23:7 24:8
**completely**  29:20
  56:8 83:18
**complex**  93:4
**computer**  77:4
**computers**  46:1
**conclude**  63:8
  64:13
**concluded**  96:24
  96:25
**conclusion**  66:5,6
**condition**  36:13
  74:21 86:23
**conditions**  74:12
**confirm**  4:20 90:7
**confirmed**  71:23
  86:6
**confirming**  37:8
**confusing**  5:17
**consent**  26:20
**consider**  13:8
**considered**  65:22

**construction**
  28:11
**consult** 85:21
**contact** 84:19 87:8
  87:13
**contacting** 87:14
**contributed** 80:23
**contributing**
  74:25 75:1,22
  76:1,4,8,17,23
  77:25
**control** 41:21
  63:25 89:2,5
  90:19 91:8,18
  92:5,11,17 93:23
**conversation** 5:23
  41:5 42:2 50:12
**convey** 86:11
**copies** 3:18 12:3
  12:24 13:3 16:11
**copy** 3:19 7:8 15:2
  15:4 16:5 17:13
  46:10 77:10
**cords** 54:15
**core** 35:17
**corinth** 37:16
**corner** 12:8
**correct** 17:11
  24:25 37:1 41:9
  64:4 75:16 77:7
  79:8 90:23 95:8
  95:22
**corrections** 95:16
  95:16
**correctly** 23:4
  95:19
**cosper** 1:4 3:13
  7:17,22 38:23
  40:17 41:6 88:10
  90:12

**counsel** 2:1 4:6
  84:14
**counties** 27:23
**country** 38:13
**county** 13:22 21:9
  37:17 39:22 40:11
  98:4
**couple** 16:11 30:3
  36:8 53:9 55:13
  71:7
**course** 35:18
  83:20
**courses** 21:1 23:4
  23:8 28:12 29:12
**court** 1:1 6:2
  46:13 74:4,5
  95:18 98:6
**covered** 28:3
**crash** 3:11,12,14
  3:20 6:13 7:4,8,17
  7:25 8:17 12:15
  12:18 13:24 14:23
  15:19,20,24 16:5
  16:11,14,15,16
  17:13,20,21,22
  18:20 19:1 20:15
  24:9 25:15 26:7
  26:14 28:13 30:20
  34:24 36:2,6,14,24
  37:1,4,16,20 38:2
  38:3 42:11,24
  43:2,4 44:13 45:3
  47:5 49:5,21
  50:20 51:5,8,23,24
  52:13,22 53:7
  55:25 57:14 60:15
  68:8 70:14 73:17
  73:20,22 74:9,10
  74:18,25 75:15,19
  77:6,23 78:1
  79:11,14

**crashes** 7:11 28:19
  29:24 32:23 36:6
  38:1
**crashing** 73:16
**cross** 63:10
**crying** 43:10,13
**cs3577058** 1:25
**currently** 35:10
**curve** 62:5,6,9
**curvy** 38:7
**cut** 13:22 43:5,7
  56:6,8,10,16 57:3
  57:19,25 59:13
  80:13,13,20
**cutting** 44:3 57:6,7
  57:23 58:2,3
  80:10,15
**cv** 1:6
**cws** 1:6

**d**

**dad** 43:5
**damage** 11:16
  47:17
**damon** 2:15,18
**date** 9:8 11:8 74:5
**day** 14:23 41:8
  42:13 49:4 51:5,8
  70:14 74:8,17
  83:14,25 98:17
**daylight** 74:22
**days** 13:6,7,9
**dbrown** 2:12
**dealing** 16:10
**debris** 54:4 55:9
  55:23 60:13
**deceased** 13:7
  73:6
**december** 11:11
  11:12 14:18 26:22
  27:12 37:2

**decide** 15:7
**defective** 33:12
**defendant** 1:8 2:8
  2:15
**defendant's** 3:9
  6:16 7:3,16,24
  10:25 12:3 15:4
  15:23 78:15
**defer** 66:22 67:6
  67:12 90:1
**definition** 87:20
  87:24
**degree** 68:18
  89:23
**dekalb** 27:23
**deleted** 14:21
**department** 20:1
  40:12 59:24 60:12
**department's**
  19:20 54:16
**depend** 44:25
**depends** 45:2
  88:25
**depict** 12:14
**depicted** 86:8
**depiction** 15:19
**deposition** 1:11
  3:2 4:1,5,16 5:2
  6:19 95:15 96:24
  96:25 98:9,10
**depositions** 5:9
  32:17
**depth** 86:17,19
**deputy** 39:22
  40:10
**described** 82:21
**description** 3:8
**details** 11:24
  72:25
**determination**
  66:2

**determine** 61:1
68:8 70:7,15 71:9
72:22 75:23 85:10
**determined** 81:4
**die** 13:7
**died** 47:25 48:15
51:12
**different** 16:11
27:22 44:15,16,17
47:3 48:4 65:12
68:9 89:12,13
91:5
**differently** 31:25
**dig** 78:7
**digging** 65:18
**digital** 14:11
**direction** 41:9
**discussed** 53:6
**distance** 58:19
**district** 1:1
**division** 1:1,2
26:20
**document** 46:17
46:19
**documentation**
40:5,6
**documenting**
24:19 96:12
**documents** 6:22
20:14
**doing** 17:2 25:23
26:9 27:5,9,15
29:20 58:13,20
80:18
**dots** 47:15 82:14
82:14
**double** 37:9 63:10
**downstairs** 84:10
**draw** 68:22
**drawing** 68:23

**drink** 5:14
**drinking** 41:11
48:7 61:2
**drive** 15:8 35:8,18
45:11
**driven** 31:15,20
34:25
**driver** 11:17 20:8
30:14 38:16 44:9
48:6 58:6 61:8
73:5 77:15,22
94:19
**driver's** 46:9 56:6
56:11 57:4,11,12
63:3,4,10 64:6
78:1,9 79:3 81:18
82:5,15,19
**drivers** 18:1 64:18
64:18,19
**driving** 88:19 89:1
**drop** 8:17 9:9
76:15 77:4
**dropped** 62:10
**drugs** 80:22
**dry** 74:19 87:5,9
87:12
**dui** 33:7,23
**duis** 32:23
**duly** 4:10 98:9
**duties** 24:16 25:6
25:10
**dwayne** 2:9
**dynamics** 89:16

**e**

**e** 98:1,1
**earlier** 61:16
85:15
**easier** 16:16
**east** 2:4 61:11
**education** 21:7

**edwin** 5:1
**effective** 3:22
78:16
**effort** 68:1
**either** 6:10 9:17,20
51:1 52:22,23
**emergency** 90:12
90:23 92:4,5,22,24
**enforce** 25:11,19
26:7,15
**enforcement**
21:23 28:6
**enforcing** 26:25
**engineers** 90:1
95:8
**entrekin** 40:9
**environment**
75:14
**equipment** 56:4
60:11
**esquire** 2:2,8,9,15
**estimate** 28:19,20
29:7,25 61:21
**estimating** 29:23
**event** 76:17,22
**events** 92:1
**everybody's** 44:19
**evidence** 19:25
79:13 80:22 85:22
89:7 96:12
**exactly** 40:7 42:3
64:23 80:12,19
**examination** 3:5
4:22 79:24 96:8
**examined** 4:11
**exhibit** 3:9,10,11
3:12,14,16,18,19
3:20,22 6:16,19
7:3,7,16,19,24 8:3
8:21 10:7,25 11:3
12:3,7,7,21 15:2,4

15:23 16:2,4
17:10 77:10 78:14
78:15
**exhibits** 3:8,24
**exist** 6:11
**experienced** 30:13
**expert** 32:15 33:3
33:9 89:16
**experts** 32:11,12
66:22 67:11
**explain** 9:24 46:10
46:12 76:14
**explaining** 10:6
43:12 51:2 71:21
84:23
**explanation** 8:12
**explorer** 34:25,25
35:1 36:1,13
38:17 51:6 53:25
55:12,25 56:4
58:18 61:11,22,25
63:15 65:7 66:3
66:24 75:25 96:16
**expression** 94:20
**extraction** 54:17
**extrication** 56:3
**eyes** 41:14 77:19
**eyewitnesses**
51:10

**f**

**f** 98:1
**fact** 28:10 91:14
**factors** 74:24 75:1
**facts** 92:3
**fail** 11:18
**failed** 9:22 78:4
96:15
**failure** 9:25 10:3
11:20
**fair** 15:19 59:19
70:21 71:6

**familiar** 12:6
37:19 78:19,20,22
78:24,25 93:24
**families** 53:3
**family** 19:2 48:4
48:10,11
**far** 92:16
**fast** 46:7 85:16
**faster** 38:14 42:20
**fatality** 13:8 48:19
49:1 51:14
**father** 46:8 48:8
**fault** 90:18,22
91:12,12
**federal** 4:7
**feel** 7:10 80:16
**feet** 61:22
**ferrill** 1:20 98:6,20
**ferry** 2:4
**field** 27:20 29:11
**fifteen** 32:25
**figure** 59:15
**file** 6:10,20 15:8
**files** 14:11,11
**filled** 8:21 11:9
16:13 80:3
**final** 66:10
**find** 14:13 47:9
62:22 77:14,24
**finding** 65:23 76:1
79:14 96:13
**findings** 69:11,13
69:15,17,19 77:10
77:13
**fine** 4:17
**finger** 13:22
**fire** 19:19 40:11
41:3 54:16 57:8
59:24 60:12
**firm** 2:3 84:11

**first** 4:16 6:18 9:1
21:6,18 24:25
25:7 31:17 43:19
43:21 59:17 61:14
76:18,20 81:17
82:6
**five** 96:6
**flag** 47:23
**flags** 47:14,23
61:10
**flight** 13:23 46:6
**flip** 36:10 69:4
**flipped** 30:20 69:5
69:25
**flips** 69:3 70:1
81:10,11,11 83:21
**focus** 57:10 58:7
61:8
**folks** 32:8
**follow** 73:1 79:19
**follows** 4:12
**ford** 1:7 34:24,25
35:1 36:1 84:14
85:19
**ford's** 86:10
**forgot** 30:22
**form** 4:14 32:2
63:13 65:8 67:1
67:15 73:19 76:10
79:16 81:7 82:2
83:2 88:2,14 92:7
95:4 96:17
**forth** 98:9
**found** 58:6 60:19
61:7 62:14 65:2
**foundation** 81:7
**freak** 64:21 89:3
**free** 7:10
**friend** 48:15 72:17
**friend's** 35:1

**front** 39:4 54:21
59:8,10 86:2
93:10
**full** 4:24 17:13,24
50:12 81:11
**fulton** 27:22 98:4
**funny** 8:9
**further** 47:6,11
49:19 61:18 98:12

**g**

**ga** 3:22 78:15
**gainesville** 1:2
**gap** 83:15,16
**general** 5:7
**generated** 20:13
**gentleman** 52:7
**georgia** 1:1,18 2:4
2:11 3:11,12,14,16
3:20 6:24 7:3,8,16
7:24 10:8,25 11:3
13:16 15:23 21:19
25:13 26:23 27:7
34:16 77:7 78:20
98:2,7
**getting** 10:22
92:19
**give** 12:6 29:24
46:3 60:8,10
68:14 72:12 91:4
96:1
**given** 5:2,9 20:1
20:12 32:17 33:11
60:9 88:12 89:20
89:24 98:11
**gives** 20:25
**glad** 9:14 16:23
57:2
**go** 4:4 6:9 19:3,9
20:19 21:2,7,11
22:4,18 23:20
26:23 27:22 29:17

36:22 38:13 42:18
44:7 45:6,6,7
46:13 47:22 49:21
55:5 58:3 60:10
62:6 65:17 68:2
71:22 73:2,11
74:4 80:17 82:3
83:4,20 95:5
**goal** 25:16
**goes** 24:3 62:5
**going** 4:14 5:22
7:7,19 8:10 10:14
10:15 15:2,2,10,11
15:16 17:5,17
19:11 27:24 32:5
36:8,23 39:2,9,10
40:13,16,18 41:22
46:8 48:10,23
53:10,13,16,21
61:9 63:1 64:2,18
67:21 72:18 78:13
80:1 85:16 93:10
95:23 96:2
**good** 14:8 28:20
36:22 51:12,18
53:18 78:9
**gotcha** 28:2 29:22
31:4 33:8,10
54:13 71:17 72:14
**gotten** 6:24 21:2
**gouge** 47:17 65:16
65:17,22 69:3
82:22 83:6,10
84:23 85:5
**gouges** 83:20
**grade** 75:10
**graduate** 21:8
22:9
**graduated** 21:9,13
22:13

**grady** 43:16 45:6 45:11 46:8 51:18 73:2,3,3,3,4

**great** 16:22 24:18 28:3,8

**groceries** 34:19

**grocery** 34:18

**ground** 66:24

**guess** 53:15 76:24 84:10 88:20 89:6

**guy** 56:20 86:6

**guys** 50:5

**h**

**ha** 34:11

**half** 28:24

**hand** 7:7,20 12:8 61:9 63:1 78:13 98:17

**handle** 31:25

**handled** 17:7

**handling** 89:13

**happen** 64:22 94:6

**happened** 37:1,4 37:16 41:16 50:1 64:23 82:11

**happening** 42:24

**happens** 51:19

**happy** 5:15,18 45:18,22

**haralson** 13:22 21:9 37:17 39:22 40:11

**hard** 19:6 35:17 40:4 51:17,18 55:18

**harmful** 76:17,22

**hate** 19:16 77:2

**head** 5:24,24 72:1 72:4,4,5,6,25

**headlight** 54:19

**hear** 41:1,2,23 42:7 43:3

**heard** 17:23 32:11 57:9 74:1 94:20 94:22

**helicopter** 45:4 57:9 73:11,12,13

**help** 7:12 16:3 67:21

**helpful** 8:5,19

**hereinbefore** 98:9

**hereunto** 98:16

**hey** 48:5

**high** 21:7,9,12,18 34:17,18

**highlight** 7:15

**highlighted** 7:20

**hired** 32:12,14

**history** 28:4 36:3

**hits** 82:5

**hold** 88:13 93:3

**hope** 12:6

**hopefully** 7:12 8:5 10:24 41:23 68:7

**hospital** 71:23

**hospitals** 51:12

**hour** 52:15 53:16

**hours** 70:14,14

**house** 42:14,17

**housekeeping** 17:3

**huff** 2:10 84:11

**huffpowellbaile...** 2:12,12

**huh** 10:11 16:21 18:4 20:24 21:16 25:9 31:11 37:24 45:15 48:13 50:9 62:17 66:1,16 68:12 70:9 84:25

**hundred** 30:3 72:12

**i**

**idea** 14:12 35:2 38:4

**identification** 3:9 6:17 7:5,18 8:1 11:2 12:4 15:5,25 78:17

**identify** 54:4 55:9

**ii** 22:24 23:5,16 28:11 29:16

**iii** 22:24 23:15,16

**imagine** 6:21

**impact** 76:5

**impacted** 66:24 68:9

**implied** 26:20

**improperly** 9:19 9:23

**inch** 78:22

**including** 79:12 96:11

**indentions** 47:13

**index** 3:1

**inflatable** 60:2

**information** 45:5 45:9,10,25 46:2,5 46:9 51:18 73:4 95:10

**initiated** 69:4,6

**injured** 31:8,12

**injuries** 11:16 13:5,19,19 72:23 73:8 80:24

**injury** 48:20,21 71:10,13 72:5,25

**instruction** 23:4

**intended** 33:18

**intention** 66:17

**intentionally** 38:22

**interested** 98:14

**interpreted** 69:4

**interview** 96:11

**intox** 27:16

**inventory** 18:22 19:14

**investigate** 79:5

**investigated** 28:19 29:24 30:1 77:6

**investigating** 44:12,24

**investigation** 6:13 18:8 25:15 26:7 26:15 28:13 49:8 49:19 53:7 62:14 62:15,21 63:8,15 64:12 65:1 68:17 72:23 77:11,23 79:11 81:1 86:25 96:13

**involved** 36:2,5 76:22

**involves** 34:24

**issue** 46:12

**iv** 23:25 24:6

**j**

**january** 22:6

**jeep** 35:12,14,15

**jeepfest** 35:16,18

**job** 1:25 14:8 21:18 22:14 24:16 24:19 25:6,10 26:5 31:1 68:2,5

**jobs** 34:16

**joey** 1:12 3:3 4:2,9 98:8

**joined** 24:12

**jonathan** 2:2

**joseph** 5:1

**jparrish** 2:5

**jpeg** 14:11
**july** 3:23 78:16
**junk** 19:17,23
54:12 79:23
**jury** 74:5

**k**

**k** 1:20 98:20
**karissa** 2:9
**keep** 17:5 27:19
78:4
**kept** 14:1
**killed** 48:7
**kind** 6:9 8:5,20
13:21 15:17 23:3
23:19 27:4,24
30:7 31:6,22 34:6
35:14,22 36:10
40:6 41:12 44:19
44:23,23 47:17
49:25 54:15 59:23
**knew** 54:24 86:1
**know** 5:14,18,25
6:11,13 7:10 8:7
8:15 9:12,12,16,21
12:10,25 13:1,2,9
13:10,24 14:2,2,4
14:11,15,20,21
16:24 18:24 19:14
20:4 28:9,14 29:3
29:5,23 30:7
33:14,19 34:4,11
35:25 36:2,5 37:7
38:25 40:1,17
41:15 42:13 43:6
43:15,17,19,21,24
45:3,17,20 46:25
47:4 48:11,22,23
49:1,23 50:10,25
51:1,25 52:6,22,24
53:2,19 54:11,22
54:24 55:1,2,2,14

55:18,21 57:13,14
57:16,20,20 58:12
58:22 59:2,12,13
60:20 62:8,8,11,11
65:14 66:14 67:21
67:24 71:11,12,13
71:25 72:1,3,12,25
73:24 79:1,1,2
80:19 83:19 85:10
87:7,16,18,19
89:19 90:4,5,9
91:7,11,19,20,22
91:24 92:3,13,19
92:20
**knowledge** 33:20
**knows** 67:22

**l**

**laid** 59:10,11,14
**lane** 9:23 10:1,4
11:18,20 63:16
78:4 91:16 96:15
**lanes** 9:19,23
**law** 2:3 25:11,19
26:8,15,15 28:6
84:11
**laws** 27:1
**lawsuit** 32:15
**lawyer** 32:14
**laying** 20:7 56:18
**learned** 43:18
**leave** 42:16 62:23
73:12
**left** 13:9 14:16,18
26:22 37:13 49:4
63:2,4,9,17 64:17
65:2 73:13 82:15
82:18,18 93:11
96:6
**level** 24:25 29:16
29:16 75:3,6,9

**levels** 23:15 24:8
**license** 46:9
**life** 13:23 46:5
48:23
**lift** 60:3,4
**light** 54:10 60:19
74:21
**limited** 33:15,20
**line** 82:14
**lines** 45:14 63:11
**listed** 7:21
**listen** 17:17 58:25
**listened** 42:2
**little** 2:17 6:12
14:1 17:2 25:5
38:14 40:13 41:2
41:5 47:6,11
55:15 60:4 61:18
68:20 82:20
**live** 37:21
**llc** 2:3,10
**loaded** 73:10
**loads** 20:8
**locations** 27:5,22
**long** 22:2,16 25:23
26:9 32:4 50:4
**look** 10:15 12:13
16:7,12 17:9 36:9
36:10 45:17,23,23
46:23 54:3 68:22
69:2 70:8,10
75:13 76:15 78:6
78:8,10 82:13
83:25 87:2,3
**looked** 7:13,14
16:23 55:15 60:22
63:7 76:18 78:2
83:24 84:9
**looking** 8:6 16:25
29:4 59:2 67:18
69:2 76:6 79:12

83:13,15
**looks** 16:13 19:17
19:22 37:10 54:23
55:12 56:3 60:16
60:21 78:12
**lose** 89:5
**losing** 93:22
**lost** 41:20 63:24
90:19 91:8,17
92:5,11,17
**lot** 7:11,12 25:13
37:25 38:10 58:9
70:13 88:25 90:6
**loud** 41:3 57:7
**louder** 57:9
**love** 14:10
**luckily** 42:17 44:7
44:7

**m**

**machines** 27:16,17
27:21,25
**main** 25:16 58:7
84:10
**maintain** 9:22,25
10:3 11:18,20
91:16 96:15
**making** 38:18
**maneuver** 92:4,11
92:23
**manufacturer**
34:13
**mark** 15:2,12
39:11 46:20 47:1
47:12,15 63:2
67:23 93:22 94:2
**marked** 6:17,18
7:4,18 8:1 11:2
12:4,21 15:5,24
18:14 48:11,17
62:1 67:17 70:24
77:9 78:14,16

**marking**   14:9 16:2
  24:19 79:13
**markings**   12:10
  81:2 82:15 83:9
  83:10
**marks**   46:25 47:15
  47:15,16,16,17
  63:2,5 64:3,6 65:6
  65:14,16,17,22,25
  66:24 67:13,14
  68:10 69:3 82:22
  83:6,10 84:24
  85:4,5
**marriage**   98:14
**materials**   6:10,20
**matter**   98:15
**mboorman**   2:12
**mean**   5:24 13:21
  19:19 25:3 33:23
  38:7 44:7 46:7
  47:19 60:16 62:10
  66:8 67:16,16
  70:6 73:18,21
  74:3 75:8 76:16
  78:11 87:1,22
  88:17,17 89:1
  91:3,6,6,7 92:10
  92:10,10,13,14
  93:13 94:1 95:21
**meaning**   13:21
  76:24 77:18
**means**   31:22 65:17
  76:14,21
**measure**   86:17
**measurements**
  18:13,19 48:18
**medical**   45:6,11
  72:16
**medication**   41:13
**medications**   48:7

**meeting**   51:22
**member**   19:2
  85:25
**mentioned**   84:16
**mess**   79:23
**met**   50:13,13
  51:23 52:18
**methodically**   6:9
**michael**   2:8
**mind**   63:23
**minute**   15:11
  16:12 46:24
**minutes**   37:21
  40:22 42:23 45:14
  45:16 52:14 80:4
  80:6,8 96:2,6
**missing**   19:11
**misstates**   92:8
  93:5
**mistake**   21:1
**model**   35:2
**moment**   17:9
**month**   44:17 49:9
  49:10,21,24 51:22
**months**   44:15
**motor**   1:7 3:11,12
  3:14 7:3,8,16,24
  84:14 85:19
**move**   8:5 10:21
  15:17 46:16 53:10
**moved**   26:12,13
  26:17 70:15
**movements**   67:13
**moving**   36:19
**mustang**   35:12,20

**n**

**n.e.**   1:16 2:4,10
**name**   4:25 9:8
  12:8 17:24 38:23
  39:25 40:1,9 50:8
  52:9

**narrative**   9:25
  93:4
**near**   59:23 80:17
**nearly**   73:22
**necessary**   88:23
  89:9 90:14
**need**   5:12,13,13
  7:9 17:6,7 36:19
  44:6,8 49:3 53:16
  59:17 67:21 81:8
**needed**   11:23
  25:20 45:25 46:9
  62:11 71:12,19,20
  71:22,22,24 88:11
**negative**   34:1,10
**never**   24:12 29:21
  34:20 61:4 73:9
  74:1,1 78:24
  94:10
**new**   47:19
**night**   47:25
**nightmare**   73:3
**nineties**   35:5
**nodding**   5:23
**nods**   6:3
**noise**   42:6 57:7
**noncollision**   76:20
**nope**   34:22
**north**   2:17
**northeast**   84:6
**northern**   1:1
**northwest**   26:17
  27:7
**notary**   4:11
**noted**   87:1
**notes**   18:7,10
**notice**   6:19 16:2
  54:11
**notified**   73:6
**notify**   51:14,15,20

**notifying**   51:12
**november**   21:14
  98:17
**number**   11:22,23
  29:5 30:23 69:19
  82:17
**numbers**   11:22
  12:9 53:22

**o**

**object**   32:2 63:13
  65:8 67:1,15
  73:19 76:10 79:16
  81:6 82:2 83:2
  88:14 92:7 95:4
  96:17
**objection**   88:2,7
  88:24 89:11 90:16
  91:1 93:4
**objections**   4:13
**obscured**   77:17
**observation**   43:1
**observations**
  36:12 72:23
**observe**   41:14
  73:7 80:10
**observed**   33:5,6
  45:21 81:2
**obstructions**   77:16
**obviously**   7:10
  16:10 17:16 36:23
  70:24
**occasion**   45:17
**occupant**   30:14
**occupants**   51:9
  52:23
**occurred**   11:11
  15:20 71:13 96:14
**occurs**   73:20
**october**   1:13 3:4
  4:3 26:11

**odor** 58:25 59:1
**office** 84:8
**officer** 21:23
**official** 16:18,19
  77:10
**oh** 17:1 29:6 30:2
  60:3 66:13,19
  70:5 76:4,6 78:1
  84:23 87:25
**okay** 4:19 5:2,11
  5:15,20,21 6:5,14
  6:15 7:2 8:19 9:2
  9:5,11,15 10:2,17
  10:20 11:21 12:1
  12:17 13:12 14:7
  14:19,22 15:16,22
  16:10,22 17:2,4,8
  18:5,10 19:24
  20:6,18 21:4,17
  22:5,12,16,21 23:1
  23:3,18,24 24:3,5
  24:8,15,18,23 25:2
  25:5,18,21 26:2,5
  27:20,24 28:3
  29:2,4,10,22 30:4
  30:12,18,21 31:4,8
  31:14,18 32:10
  33:1,14,22,25 34:4
  34:11,20,23 35:2,6
  35:10,22 36:16,22
  36:25 37:23 38:6
  38:9,16,24 39:1,7
  39:16 40:2,13
  41:1,4,22,23 43:14
  43:17,24 44:10
  45:8,12 46:18
  49:2,12,14,17 50:2
  50:7,14,17 51:4,21
  52:3,8,12,16 53:5
  53:12,19,20 54:2
  54:13,18 55:3,7,11

55:17,23 56:2,25
  57:10,17,21 58:11
  58:14,21 59:5,8,21
  60:6,25 61:6,21,25
  62:20,20 63:6
  64:10 65:1,13,20
  66:7,11 67:10
  68:24 69:8,22
  70:2,23 71:17
  72:7,10,19 73:7,14
  73:23 74:7,13,18
  75:7,11 76:12,16
  77:1,5,22 78:3,5
  78:13 79:17,20
  80:7 81:14 82:1,4
  82:20 83:8,23
  84:3,5,8,16 85:5
  85:18,24 86:4,10
  86:13,15 91:13
  92:12,22 93:24
  94:4,7,10,13,16,20
  94:24 95:11,23
  96:3,19
**old** 55:20
**once** 42:15 45:24
  45:24 46:5,15
  47:15,21 61:7
  64:19
**oncoming** 63:16
**ones** 55:20
**online** 8:23,24
**open** 76:8
**operator** 21:24
**opinion** 33:11
  70:19 83:9
**opportunity** 95:14
**orange** 83:10
**order** 22:20,22
  53:14 70:6
**original** 3:24,24
  8:25

**ought** 38:14
**outcome** 51:19
  73:24 98:15
**overcorrect** 63:21
  64:19,21 89:4,4
  91:17 92:16
**overcorrected**
  41:20 63:9,24
  64:14,17 91:9,10
  92:16,18 94:2,9,18
  94:23 96:16
**overcorrecting**
  92:25 94:1,14
**overcorrection**
  63:17 65:2,3
  87:21 88:1
**overlay** 3:13,15
  7:17,25
**oversteer** 94:8
**oversteered** 93:18
**oversteering** 81:23
  81:24 93:1,12,21
  93:25 94:11,21
**overturn** 66:9,9
**overturned** 85:3
  91:15
**overturning** 83:22
**overwhelm** 8:4

**p**

**p.a.** 2:16
**p.m.** 37:5,11,13
  97:1
**paces** 2:4
**page** 3:5,9 16:7
  86:3
**paint** 46:20,24
  47:1
**paper** 8:4 54:23
**paralegal** 2:9
**paralyzed** 48:22

**parameters** 34:6
**paren** 76:8,9
**parentheses** 47:18
**parrish** 2:2,3 3:7
  4:13,19 5:19 32:2
  49:11,13,22 50:2
  63:13 65:8 67:1,4
  67:15 73:19 76:10
  79:16,25 81:12,23
  82:5 83:8 88:4,8
  88:20 89:6,12
  90:21 92:12 93:7
  93:15 95:7,12
  96:17,22
**parrishfirm.com**
  2:5
**part** 24:12,16
  36:17 44:15 45:18
  49:13 56:10 57:14
  62:14 63:14 64:12
  65:1 68:15,16
  72:3
**parties** 98:13
**parts** 66:23 68:9
  80:11
**party** 10:14
**passenger** 30:7,14
  32:1 39:4 54:18
  57:25 59:9,11,22
  82:6,8
**patch** 87:8,13
**path** 70:25
**patrol** 6:25 10:8
  13:17 21:14,19
  26:24 34:16 68:21
  73:13
**paulding** 14:14,16
  14:18 26:13,22
  27:8 28:25
**paulding's** 14:17

paved 49:15,25
pavement 84:19
 87:5,9,12,14
pay 22:20,22
 46:13 74:2,3 79:4
peachtree 1:15,16
 2:10 84:6
pedestals 55:13
people 5:23 20:2
 27:21 30:23 38:13
 47:3 50:10 56:22
 58:9 89:1,2
percent 72:12
perfect 40:6 96:6
period 13:15
person 18:3 43:19
 43:21 51:13 59:17
 88:15
personally 73:7
 80:10
phone 2:15 13:2
 14:5 48:5
photo 45:22,23
 54:3 55:5 60:9,18
 62:2 63:1,7,16
 64:2,4 65:6 68:13
 78:8,9 82:13
photographic
 85:22
photographing
 14:9,9 24:19
photographs 3:18
 12:4
photos 12:14,14
 12:18,20 13:15
 14:21 18:16 20:14
 36:9 46:23 50:15
 50:17 53:13,24
 83:25
physical 19:25

pick 56:20,23
 58:22
picked 86:25
pickup 31:16
picture 61:14 86:5
 86:9
pictures 13:4,11
 14:10 19:16
piece 56:11
pieces 74:15
pillar 56:6,11,14
 57:4,11,12,25
pillars 80:11
pillow 60:16
pinned 43:7
plaintiff 1:5 2:2
play 41:22 43:9
 45:18
played 40:20
 41:25 86:20,23
 95:1,2
plaza 2:3
please 4:7 37:9
 81:9
point 5:12 7:10
 25:10 40:23 43:18
 53:24 55:10 59:16
 62:23 63:6 66:3
 66:25 67:14 68:13
 68:15,16 84:17
 89:8
pointing 71:15
police 20:1 37:8
policy 13:6
pollard 7:22 11:12
 38:19 39:2 40:17
 40:24 41:6 42:7
 43:1,19,25 50:11
 52:23 62:2 63:9
 63:19 64:14 71:8
 73:25 77:14 79:12

88:9,9 96:11,14
port 72:4
portion 56:14
poseyville 37:17
position 22:14,17
 59:16
positive 34:1,10
possible 46:7
possibly 41:15
post 13:1 14:14
 20:23 22:15 25:8
 25:12 26:18,21
 44:16
powell 2:10 84:11
practice 46:22
precise 29:5
precision 85:11
preference 95:20
present 11:12
pretty 5:19 25:15
 37:19 38:3,12
 42:12 51:12 61:19
 71:18 73:21 90:5
previous 8:17
 60:18
previously 5:4
 13:4 58:1
primary 31:22
print 10:14
printed 10:22
prior 24:9 36:6,14
 92:8 93:5
probably 6:21
 7:11,11 25:12
 28:22,25 30:2
 31:15 35:24 42:19
 48:9 50:22 52:1,9
 86:24
procedural 44:23
process 13:14
 44:23

product 33:12
proper 78:4
properly 27:19
property 11:16
prosecutable
 13:19 48:6
prosecute 48:11
protocol 44:11
provide 14:4
provided 43:24
public 4:11
pull 57:1 90:10,11
pulled 15:14 57:19
purchase 16:6
purpose 15:6
pursuant 4:6
push 10:19
put 9:20,24 12:2
 12:10 20:2 25:1
 34:6 42:18 44:18
 47:18,23 50:1
 53:14 59:24 60:3
 67:25 68:1,19
 69:23,24 75:5,8
 94:10,19

## q

qualified 33:3
quality 14:10
quarter 81:4,12
question 4:14
 17:16 28:17 65:12
 66:20 68:7 87:16
 88:18,21 91:2
 92:14 93:4 95:8
questions 5:17
 8:10 14:8 15:17
 36:9 41:4 49:3
 52:14 66:21 79:22
 80:1
quick 36:11 42:12
 60:10

**quickly**  21:3 36:19
  53:11
**quite**  79:23

**r**

**r**  2:8 98:1
**radio**  21:23 51:15
**rained**  74:16
**raining**  74:15
**raises**  22:20,22,25
  23:23
**ran**  41:18 47:6,11
  64:16 78:2 91:9
  92:15
**randy**  40:9
**ranks**  22:19
**rate**  69:13,15
**read**  16:17 95:15
**ready**  4:4 8:7
**real**  36:11 60:10
**realize**  83:15
**really**  6:3 8:19,19
  13:18 14:8 25:3
  38:1 41:3 44:8
  45:2 50:25 51:15
  55:19 60:21,23,23
  67:23,24 73:9
  75:8,9 88:18
**rear**  78:9
**reason**  5:13 14:7
  49:6 61:25 88:8
  88:10,21
**recall**  14:24 15:13
  23:7 40:18 41:6
  43:10 50:18 55:24
  60:21
**recess**  96:7
**recognize**  10:24
  11:5 39:17 60:13
**recon**  22:24,24,24
  23:25

**reconstruct**  23:18
  24:15,20 66:15,22
  69:8
**reconstructed**
  29:10,12
**reconstruction**
  23:15 24:5 67:9
  68:2
**reconstructions**
  24:11
**record**  4:4,25 81:8
  98:10
**recorded**  51:1
**red**  59:25
**reference**  7:9
**refused**  72:16
**regardless**  90:18
  90:19 91:9
**regularly**  27:25
**reissued**  14:20
**relate**  28:13
**related**  6:20 7:13
  12:18 20:14 51:24
  53:7 77:14 98:12
**remember**  5:12
  14:6 39:23 50:7
  50:12,22 52:5,6
  54:10 60:20,21
  71:13,19
**repair**  34:21 36:3
**rephrase**  5:18
  67:2,4
**report**  3:11,12,14
  3:21 7:4,9,14,17
  7:25 8:15,21,22,23
  8:24,25 9:7 10:13
  13:8 15:24 16:5
  16:11,15 17:13
  20:23 37:9 39:3
  46:11,12 68:19
  69:24 71:15 76:3

76:7 77:3 80:3
  87:2 94:10
**reporter**  6:2 95:18
  98:6
**reports**  8:17 18:23
  94:3,17
**represent**  7:7
**representatives**
  85:20 86:10
**representing**  52:1
**requested**  20:22
  74:5
**requests**  6:22
**reserve**  4:13
**respect**  77:13,15
**responsibilities**
  26:6
**responsiveness**
  4:15
**rest**  53:24 59:16
  66:10,25 67:14
  68:14 74:16 82:8
**result**  31:8 96:10
**resurgens**  2:3
**retain**  19:25
**retained**  20:4
**return**  49:5
**rica**  22:15 25:8,12
  25:16,24,25 28:23
  28:23
**ride**  44:17
**right**  5:22 6:7
  10:18 11:8 12:8
  15:1 16:1 18:7
  19:5,8,13,18,21
  20:20 21:11 24:3
  27:1 28:16,17,18
  32:18 33:22 34:15
  35:24 36:17,18
  37:4,15 39:14,20
  42:1,4,10,17 45:13

46:22 47:24 52:10
  52:18,21 54:20
  56:10 59:22 60:8
  61:9,11,17,22 62:1
  62:5,18,25 63:19
  64:15,24 65:3,5
  67:19 68:5,23
  69:3,5 70:18 71:6
  71:16 75:2,21
  76:9 77:13,25
  79:1,10 80:9,19
  82:10,12,24 83:14
  83:23 85:5 91:15
  91:19 93:9,10,15
  93:18 95:7,11
  96:1,4,10,19,23,23
**rims**  65:18 83:6
**road**  2:4 37:17,19
  38:2,13 41:18,20
  42:8 46:17,20
  47:6,22 49:15,25
  59:6 61:11,23
  62:1,16,23 63:8
  64:16,19 65:19
  68:9,10 73:15,16
  74:12,19,19 75:2
  75:10,18 84:20
  85:13 89:2 90:8
  91:10,14 92:15
  93:19
**roadway**  47:13,14
  61:12 62:22 74:24
  77:19 78:2 81:3,3
  83:7
**robin**  1:20 98:6,20
**rock**  2:17
**rode**  47:3
**role**  22:2 86:20,23
  95:2,2
**roll**  30:7,12 66:4
  69:15 83:12,14,17

**rolled**  70:20
**rolling**  44:25 45:2
  84:21 85:8
**rollover**  30:13,15
  65:3 73:15,20
  76:21,23 95:2
  96:14
**rollovers**  29:25
  68:25
**rolls**  69:20 70:7
**rome**  26:12 27:8
**ronnie**  3:15 7:25
  39:4
**roof**  81:16 82:6
**room**  51:15
**rotation**  64:9,14
  93:13,14,20
**round**  55:20
**rpr**  1:20 98:20
**rubber**  87:14
**rude**  5:25
**rule**  74:24
**ruled**  75:14,18
**rules**  4:7,18
**run**  18:17 27:18
  41:20 46:2 47:6
  64:19 89:1
**running**  28:1

**s**

**s**  31:7
**saw**  17:10
**saying**  33:17 38:10
  38:11 68:6 92:25
**says**  47:5 76:8,11
  78:21
**scene**  12:15 14:9
  15:14,19 18:2,11
  18:13,14,20 23:5,5
  24:20 28:10 39:20
  45:22 49:4,5,22
  50:3 59:3 67:17

**school**  9:1 21:7,9
  21:12,18 22:4,6,10
  22:13 23:10 34:17
  34:18 44:16 55:20
**schooling**  21:11
**scrapes**  83:7
**scratches**  70:8,11
**screen**  15:8
**scrt**  23:22 24:2,12
  48:1,2,5,15,19
  67:8 85:21,24
  86:6 90:6,11
**searched**  8:11
**seat**  43:6,7 59:9,11
  59:12
**seated**  59:8
**second**  15:11,12
  16:7 39:9 50:3
  88:13 93:3
**seconds**  40:22
**section**  10:4 76:7
  78:18,21 79:8
**security**  26:23
  27:9
**sedans**  30:7
**see**  6:1 12:7 15:13
  16:2 17:22 18:10
  18:16,19,23,24
  23:16 28:24 39:11
  40:18 44:17,19
  51:6 54:18 55:19
  56:11 58:20 59:22
  60:11,22 61:10
  63:16 66:8 68:11
  70:25 74:14 75:4
  76:3,7 77:21 79:2
**seeing**  59:5

**seen**  17:21 20:13
  30:6,10 47:10
  58:19 59:3,14
  73:10,11,12 85:17
  90:8
**segments**  42:14
**seized**  8:9
**seminars**  32:6
**sense**  25:6
**sensor**  33:24 34:9
**sent**  6:22 44:16
  86:6
**separate**  17:18
**sequence**  76:20
  91:20 92:1
**sergeant**  39:24
  40:9
**serious**  13:5,18,24
  38:3,12 47:4
  48:20,21
**service**  36:3
**set**  98:9,16
**seven**  47:3
**severe**  73:17,22
**sewn**  71:12
**shaken**  43:2,4
**shakes**  6:4
**shaking**  5:24
**sheet**  7:15,20
**sheets**  8:7,11
  18:22
**shoot**  64:21
**shoots**  64:20
**shop**  34:21
**short**  66:11
**shortcut**  66:21
**shortly**  12:15
  15:20 42:11
**shot**  15:9 32:4
**show**  10:23 15:10
  15:11 39:10 40:13

**45**:22 53:9,15,21
  64:2 77:4
**showed**  40:10,11
**side**  10:19 12:2
  54:18 56:6,11
  57:4,11,12,25
  59:23 61:12,22
  63:3,3,4,10 64:6
  78:9 79:2 81:15
  81:17,18,19 82:5,6
  82:8,15,16,18,19
  91:14 93:19
**sideways**  56:19
**sign**  11:14 95:15
**signature**  11:5
  16:8 17:10 95:18
  95:24 98:19
**similar**  52:14
  94:17
**simple**  68:4
**simply**  91:13
**single**  19:6
**singleton**  2:15
**sir**  5:5 7:10 11:5,7
  12:1,16,19,22
  14:25 15:15,21
  16:8,9 17:12,14
  18:6,12,14,18,21
  21:20 23:6 24:4
  24:10,14,17,22
  27:3,11 28:5,7,15
  30:16,17,19,20
  31:21 32:9,16,19
  32:21 33:13 34:14
  34:22 35:1 36:4,7
  36:15,21 37:3,6,12
  37:14,18,21 38:15
  39:6,19 40:25
  42:5,9,12 43:20,23
  44:1,14 46:21
  50:9,16 51:7,11

52:20 53:1,4,8
54:1,21 56:1,5,7,9
57:5 58:19 59:18
59:20 61:3,13,15
61:24 62:19,24
63:12,18 64:5
65:4 69:10,12,14
69:16,18,21 70:9
70:12,17,22 71:2,5
72:16 73:9 74:20
74:23 75:17,20
77:8,12 79:9,15
80:6,15,21,25
81:13 82:9,23
83:1,11 84:2,13,15
85:7,9,14,23 86:12
86:14,18,21 87:6
87:22 89:10,15,18
89:21,25 90:3
92:21 94:12,12,15
95:3,6,14
**sit**  24:24 80:13
**sitting**  67:18
**situation**  90:13,23
92:4,5,23,24
**skid**  47:15,16
**skills**  89:1
**skip**  70:23
**slide**  56:23 58:23
**slides**  93:8
**sliding**  65:18,21
83:22 84:22 85:3
93:11
**slot**  72:4
**slung**  18:25
**smell**  41:13 58:25
61:4
**sole**  79:14
**somebody**  40:15
57:12 70:18

**somers**  2:16
**somewhat**  62:4,7
**sooner**  21:2
**sorry**  76:6 78:6
81:6 93:3
**sort**  10:9 66:17
95:17
**sounds**  10:9 31:15
59:16 67:24
**space**  83:21 85:1
**speak**  44:8 85:21
85:24
**special**  22:23 72:4
**specific**  15:17 36:1
36:9 55:9 66:23
67:12
**specifically**  7:22
70:15
**spectacular**  47:20
**speculation**  83:3
88:14 90:16
**speed**  69:11 85:10
85:11,15
**speeding**  41:19,19
85:12
**spelling**  95:16
**spend**  36:23 66:14
**spoke**  84:17 85:19
**spoken**  32:6
**spot**  50:1
**ss**  98:3
**standing**  56:12
58:24
**stands**  54:8
**start**  39:9 40:19
47:5 63:5 71:8
91:25
**started**  21:13
46:16 47:10,12
61:19 74:15 83:12

**starting**  26:2
47:19 64:8
**starts**  42:3 64:13
64:22 83:17
**state**  3:20 4:24
6:24 10:8 13:16
14:3 15:23 21:14
21:19 25:13 26:24
34:16 77:7 81:8
98:2,7
**statement**  45:24
**statements**  17:15
17:19 18:1 42:10
50:19 58:25
**states**  1:1 94:19
**stay**  42:14 44:3
58:4,16
**stayed**  25:25 26:11
**stitched**  71:24
**stitches**  71:19
**stood**  55:3
**stop**  25:17 39:12
47:16 65:6,14,17
**stopped**  40:21
**stopping**  39:14
**store**  34:19
**straight**  47:17
75:3,4,6,9
**straightaway**  62:5
62:7
**street**  1:16 2:10
84:6
**stuff**  10:19 14:17
17:5,6,7 18:25
19:4 48:16 54:14
54:15 57:6 60:17
67:22 68:21
**subjective**  88:4
**subpoena**  3:10
6:16 74:2,3,4,6

**suburban**  31:24
**sue**  19:12
**suggest**  86:13,19
**suite**  1:17 2:3,10
2:17
**summons**  3:17
11:1
**sun**  77:19
**sure**  4:21 5:19
15:18 19:24 20:11
27:18,25 32:11
35:25 37:8 38:18
46:3 49:7 50:24
65:10 67:3 68:25
70:3 76:16 84:21
**surface**  74:19
**surprising**  30:21
30:23
**suvs**  30:7 31:20,25
**swear**  4:8
**switch**  72:21
**sworn**  4:10 98:9

---

t

**t**  98:1,1
**tables**  55:16,19
**take**  5:15 6:3 8:6
10:15 12:20 13:4
13:14,15 16:3,12
17:15,18 18:7,13
20:2 22:23 23:14
23:23 26:21 35:16
45:17 46:2 50:15
50:17,19 53:13
54:3 56:16 70:7
70:10 72:18 75:13
78:6 96:2
**taken**  4:6 21:1
41:12 72:15 96:7
**takes**  70:13
**talented**  6:2

**talk** 6:9,11,12
15:12 18:2 36:24
44:7 49:11 59:17
**talked** 17:20 28:10
50:20 52:13 57:11
63:20
**talking** 18:3 32:24
34:3 43:10 53:22
54:6 59:25 60:1,2
64:3 69:25 70:1
71:22 79:12
**tape** 18:17
**taught** 47:2
**teach** 23:21
**team** 23:22 24:2
24:13 29:18 48:1
48:2,15 67:8
85:21,25 90:11
**teams** 90:6
**tell** 6:8 9:18 10:7
10:18 11:4,8 15:1
16:5,12 19:1,2,9
27:15 46:22 50:5
52:9,10 54:3 55:8
60:23 65:24 80:12
**telling** 50:23 83:5
**tells** 90:5
**ten** 30:1,2 35:8
80:6
**term** 88:4 93:24
94:7
**terms** 70:25 71:9
77:22 91:19 92:1
**terrible** 51:19
67:24
**territory** 26:11
**test** 27:17,18
**testified** 4:11
32:20,22
**testify** 3:10 6:17
34:8

**testimony** 33:15
34:7 92:8 93:5
98:11
**tfc** 22:19 23:2 25:3
25:3
**thank** 6:7 10:5
12:1 62:12 79:17
**theirs** 19:19 55:22
**thing** 5:16 7:6 8:3
10:23 12:5 19:7
20:17 21:6 26:7
26:14 27:5 34:2
42:18 45:19 49:1
50:23 66:17
**things** 5:11 17:17
20:3 36:24 41:17
42:13 46:25 53:9
60:12 62:3,9,16
63:22 71:7 95:17
96:15
**think** 4:18 8:4
9:24 16:5 18:25
25:12 28:9,9
29:12,15 31:25
39:24 40:16,16
41:15 43:15 45:12
66:11 68:19 70:2
71:23 72:17,24
73:11 81:3 82:21
83:21 84:16 95:12
96:5
**thinking** 41:17
42:7 62:2,15
91:23 96:14
**third** 10:13 36:17
**thought** 55:3
88:11,23 89:9
90:14,24
**three** 22:3 40:3
44:15 50:5 69:24
69:25 78:2 81:4

81:10,11
**throws** 20:8
**thumb** 15:8
**ticket** 11:11 43:13
71:21 85:13
**time** 7:23 8:6,18
8:20 11:13 13:15
16:13,16 18:20
21:3 25:11 35:19
36:23 38:8 39:12
44:13,13 45:5
50:15 55:25 57:3
60:14 66:15 74:9
74:10,18 77:23
78:1 79:18 80:4
81:2,4 86:16 87:5
87:6 88:12,23
89:20,24 91:23
**timeline** 28:4
**times** 32:22,25
35:8 64:20 69:24
69:25 70:19 73:16
**timing** 96:5
**tips** 66:3
**tire** 20:3 63:2 64:3
64:6 65:6,14,25
66:24 67:13,14
68:10 78:9,10
79:2,3,7 86:2,2
87:7,10
**tires** 47:24 61:22
63:3,5,7,10 78:11
78:21 82:15,16
83:6,19,20 86:1,3
86:7,20,22,23 87:2
87:3
**title** 21:21 24:24
**today** 24:24 48:6
66:18 80:14
**told** 13:3 19:15
41:6,6,7 42:4

43:15 62:9,15
63:19,22,23 71:21
71:23 72:24 80:15
81:3 85:15
**top** 56:17 76:5
**torso** 72:9
**touch** 11:24
**touched** 68:15,16
71:1
**tough** 41:2
**traction** 87:9,10
87:17
**traffic** 3:16,20
11:1,4,10,15 15:24
25:11,19 26:8,15
26:15 27:1 63:16
**trained** 44:5 94:25
**training** 23:5
24:12 29:13 32:7
**transcript** 3:25
15:7
**transferred** 26:4
**transportation**
31:23
**travel** 63:15 70:25
**traveling** 41:10
85:12
**tread** 78:10,22
86:17,19 87:8,11
87:12
**treads** 20:3
**treatment** 43:24
72:15,16
**trees** 77:20
**trial** 32:20,22 33:4
33:24 74:5
**trick** 17:16
**tried** 10:9 20:11
20:21 46:6 92:15
**troop** 27:13,14
48:3,3

**trooper** 1:12 3:3
4:2,5,9,24 9:1
22:4,6,9,13,15,18
23:9 24:25 25:4,8
26:19,25 44:14,16
47:2 79:18 98:8
**troopers** 23:5
**truck** 35:13,22
**trucks** 31:16 41:3
57:8
**true** 5:19 63:21
75:19 77:9 89:13
89:17 92:6,10
96:16 98:10
**truly** 85:2
**trust** 95:18
**try** 14:12,14 38:22
39:2 44:6,18 45:4
46:16,24 51:18
56:19 58:4 59:15
66:18 68:22 73:4
79:22
**trying** 16:18 17:16
19:11 37:7 39:24
44:3 45:9 46:8
47:9 56:19,22
58:22,25 59:3
60:4 62:13 70:2
90:23
**tturner.com** 2:18
**tuesday** 1:13 3:4
4:3
**turn** 13:16,20 64:8
70:1,1,1 81:15,16
81:17 93:8,9
**turned** 14:2,15,16
69:23 88:11,22
89:8,20,23 90:13
90:20,24 91:20
92:2,2,20

**turner** 2:16
**turning** 81:22
90:22 92:4,23
**turns** 81:5,12,15
83:7,18 93:1
**twice** 96:16
**two** 5:10 11:22
20:19 28:23 32:17
40:22 49:10,24
50:4 51:23 67:20
78:4 81:15 82:13
82:14 83:10 84:18
84:18 86:1,7 96:1
**type** 55:19
**types** 30:6,10
**typo** 8:13
**typographical**
95:16

**u**

**uh** 10:11 16:21
18:4 20:24 21:16
25:9 31:11 37:24
45:15 48:13 50:9
62:17 66:1,16
68:12 70:9 84:25
**understand** 5:17
23:3 31:16 35:24
45:16 62:13
**understanding**
29:4
**understeering**
94:21
**understood** 17:25
20:10 23:13 28:2
29:19 42:21 44:10
44:21 46:14,18
48:13,24 49:20
51:21 57:24 58:8
62:20 64:1 68:6
79:6 90:21

**undertake** 70:21
71:3
**uniform** 3:16
10:25 11:4 42:18
42:19
**united** 1:1
**update** 8:16 9:4
**updated** 8:16
27:19
**upgrade** 10:9
**upper** 71:14,14,18
72:3,8
**upright** 81:14
**ups** 79:19
**upset** 43:10
**use** 13:2 16:18,22
33:17 39:2 44:12
44:24 47:14 54:16
68:21 81:20 94:7
94:8,8,13,18
**usually** 11:17 13:4
18:25 19:1,2 38:2
38:12 44:1 47:15
47:18 51:11,19,20
58:1 64:22 65:18
67:22 72:8 83:5
83:16 94:5

**v**

**v** 23:25 24:3,6,9
28:12
**vague** 88:3 90:17
**validation** 86:5
**valuable** 19:3,10
**various** 8:11 27:5
**vehicle** 3:11,12,14
7:4,8,17,21,25
18:22 19:10 20:3
31:6,12,19 44:3
47:8 54:6,9 58:17
60:4,14 61:17
64:8,13 65:21

67:12 68:9,14
69:7 70:8,15,19
73:16 75:23,25
76:2,9,22,24 80:11
80:11 81:14,23
82:25 83:12,18
84:22 89:5,16
91:15 92:6,11,11
93:1,9,14,18,23
95:1
**vehicle's** 93:8
**vehicles** 12:15
30:6,12 35:10
46:16 64:20 67:20
67:21 89:12 90:4
**version** 10:13
**versions** 8:11
**versus** 80:13
**vicinity** 13:21
**video** 3:19 14:24
15:3,5,9,18,18
17:18 18:3 39:8,9
39:14 40:14,20
41:8,25 45:12,13
45:23 51:2 71:20
73:12
**videos** 20:14
**villa** 22:15 25:8,12
25:16,24,25 28:23
28:23
**violation** 79:8
**visibly** 43:2
**vision** 77:15,17
**visit** 50:3
**voice** 43:3
**vs** 1:6

**w**

**wait** 38:18,18,18
**waive** 95:17,24
**walk** 8:20 40:15
45:21 58:17

**walked**  52:10 59:6
**want**  5:11 6:9 15:7
  15:13,18 20:21
  25:1,5 35:25 39:8
  39:13 40:5,15,18
  43:15 44:4 47:5
  53:9,14 57:10
  59:15 66:12 87:18
  91:8 92:14
**wanted**  4:19 24:1
  34:4
**wants**  90:12
**warranted**  85:12
**watched**  41:7
  71:20
**water**  5:14
**way**  6:8 13:21
  17:6 28:12 33:16
  35:19 41:8 44:4
  44:19 46:15 57:14
  58:10,15 68:2,13
  80:17,23 89:22
  92:2 98:14
**we've**  6:1,21 8:2
  8:11 17:6 28:10
  29:15 32:12 40:5
  53:16 57:10 64:3
  77:9
**weather**  74:8
**week**  84:1 85:20
**went**  9:6 22:6 42:8
  49:14,24 50:13
  61:11,17,25 62:16
  69:5 91:14 92:16
**wheel**  88:11,22
  89:8,19,23 90:13
  90:20 91:21 92:2
  92:3,21
**wheels**  82:25
  84:18 93:10,11

**whereof**  98:16
**white**  52:7
**wider**  64:7
**wilson**  1:12 3:3
  4:2,5,9,24 5:1
  98:8
**windshield**  57:13
**wingo**  18:24
**wingo's**  19:12
**witness**  4:8,10
  17:22,24 49:12
  79:20 82:4 95:21
  95:25 96:3 98:8
  98:11,16
**wondering**  43:18
**wood**  55:13
**word**  6:2
**words**  93:9
**work**  11:15 26:23
  28:4,22 34:20
  42:14 44:18 47:20
  70:13 96:10
**worked**  9:21 25:13
  26:12 33:6 34:12
  34:18 47:4
**working**  26:25
  27:12,19 34:15
  44:2,20 50:11
  58:2,4 67:11
**wow**  21:17
**wrangler**  35:15
**wrapping**  54:23
**wreck**  9:21 11:10
  11:25 38:8 42:16
  48:2,6 49:19
  64:22 68:3,3,4
  80:5,23 93:17
  94:18
**wrecker**  20:8
**wrecks**  25:14
  38:11,12,12 47:20

94:5
**wrist**  31:9
**write**  11:17,19
  19:6 50:8,9,21
  85:17 94:3
**writing**  43:12
**written**  17:18
  44:11,22 95:19
**wrote**  11:11,13
  78:24 87:4

**y**

**y'all**  85:15
**yaw**  47:15,16 63:5
  69:13,17 93:22
  94:2
**yawing**  65:17
**yeah**  16:15 17:1
  22:1 27:8 29:6
  30:5,22,25 31:5,24
  33:2 34:4,8 40:8
  49:24 54:8,14
  55:20 56:16,21
  60:7,17 61:16
  62:4,10 63:4
  64:16 66:13,19
  67:5 72:20 75:12
  76:13 80:8 81:21
  81:22 82:17 83:5
  84:21 85:1 87:13
  91:22 93:16 95:9
  95:9
**year**  21:8 26:22
  28:23 35:2,20
**years**  22:3 28:24
  40:4
**yellow**  63:11
**yep**  81:25
**young**  35:7

**z**

**z71**  35:23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.