**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| CINDY COSPER, Individually, as surviving child of Ronnie Ammerson | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | **NO. 2:18-CV-00189-RWS** |
| FORD MOTOR COMPANY | ) ) | |
| Defendant. | ) ) ) | |

---

## PLAINTIFF'S AMENDED[1] RULE 702 MOTION ("DAUBERT MOTION") REGARDING CERTAIN PROPOSED EXPERT TESTIMONY AND SUPPORTING MEMORANDUM

---

Plaintiff, CINDY COSPER, by and through counsel, submits the following Rule 702 Motion ("Daubert Motion") Regarding Certain Proposed Expert Testimony as required by the scheduling order:

### A.    INTRODUCTION

1.    This diversity case arises from a single vehicle rollover incident involving a 2000 Ford Explorer 4x2 Sport Utility Vehicle ("SUV"). The incident

---

[1] Amended to correct a formatting error

occurred on December 25, 2015, on Corinth Poseyville Road in Georgia.

2.      At the time of the accident, Plaintiff Cindy Cosper was operating the Explorer, and her father Ronnie Ammerson was a passenger in the front seat of the truck. During the course of their trip, Ms. Cosper's attention focused away from the road and she permitted the Explorer to drift off the shoulder of the roadway. As she steered to reenter the road, the rear-end began to slide counterclockwise. Ms. Cosper attempted a corrective steer in a clockwise direction. During the course of the counter-steer, the rear-end broke away (began to spin clockwise) and the tires lost traction and began to slide. The Explorer then rolled over in the middle of the roadway. The truck rolled twice coming to rest on its side.

3.      During the rollover, the vehicle sustained massive amounts of roof crush or intrusion on the passenger side above where Mr. Ammerson was seated. As a result of the accident and roof damage, Mr. Ammerson suffered a spinal cord injury and was paralyzed. Mr. Ammerson died on May 7, 2016, from complications associated with his injuries.

4.      The Plaintiffs filed suit alleging that the 2000 Ford Explorer is defective and that Defendant Ford Motor Company ("Ford") was negligent in designing, manufacturing, and selling the vehicle. The Plaintiffs claim that the Explorer has insufficient handling and stability characteristics to prevent a rollover during emergency steering maneuvers, and that the vehicle suffered from insufficient

crashworthiness in roof structure and safety belt design. Plaintiffs also contend that Ford supplied defective or insufficient warnings of the dangers associated with these alleged defects.

5.    The Plaintiff seeks compensatory damages for the pain and suffering and wrongful death of Ronnie Ammerson. Plaintiff also seeks punitive damages.

## B.    SUMMARY OF ISSUES

The issues addressed in this motion pertain to expert-related testimony proffered by Ford pursuant to the deadline and pursuant to Rule 702. The Plaintiff challenges the testimony because the identified issues are not supported with scientifically valid data, test results, scientific protocol, or objective methodology, and should be excluded under Rules 702, 401, 402, and 403. The Plaintiff is not challenging the qualifications of a given expert, but only the reliability and validity of certain opinions.

## C.    APPLICABLE LAW

6.    Federal Rule of Evidence 702 ("FRE 702") governs the admissibility of proposed expert evidence and provides that "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

7.     The trial court is referred to as the gatekeeper and has the responsibility of determining that the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 589-91 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). The trial court must also "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

8.     The Eleventh Circuit has described the assessment as a three-part inquiry, instructing courts to consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), reh'g and reh'g en banc denied, 172 F.3d 884 (1999).

9.     Where reliability is at issue, the relevant factors to consider include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of

error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1262 (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003)). These factors are illustrative, but not exhaustive, and not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. *Id.*

10.    It is important to note that expert testimony that does not meet all or most of the *Daubert* factors may sometimes still be deemed reliable and admissible. *U.S. v. Brown,* 415 F.3d 1257, 1268 (11th Cir. 2005).

## D.    CHALLENGED OPINIONS

### 1. <u>EXPERT DON TANDY</u>

Ford designated Don Tandy to conduct an accident reconstruction. Mr. Tandy testified in his deposition that his analysis did not attempt to calculate either the amount of steering input or the rate of the steering input used by the driver of the explorer in this crash. The actual testimony was as follows:

> 18
> 1  Q  As a part of your accident reconstruction, sir, at any
> 2      point did you attempt to calculate either the amount of
> 3      steering input or the rate of the steering input that
> 4      Ms. Cosper put into the vehicle at the steering wheel?
> 5  A  No, I don't have any way of doing that.[2]

---

[2]      Tandy, Jr., PE, Donald F. , (Page 18:1 to 18:5).

Although Mr. Tandy made no effort to scientifically determine the amount of steering involved, he then chose to characterize the driver as having "violently" steered the vehicle. It goes without saying that an expert cannot, or should not, be permitted to characterize one or more steering wheel inputs as "violent" without making any effort to scientifically characterize the nature, degree and amount of steering used. Without knowing what steering was used, it cannot be characterized as Mr. Tandy desires to advocate. Mr. Tandy's opinion characterizing the steering is not supported with scientifically valid data, test results, scientific protocol, or objective methodology, and should be excluded under Rules 401, 402, 403 and 702.

In conclusion, Mr. Tandy's testimony on this point is unreliable and inadmissible because the theory was not even evaluated by the witness; has no support in testing; has not been subjected to peer review and publication; there is no rate of error information provided; the testimony has no foundation in science; and the testimony is inconsistent with published literature.

The second issue relating to Mr. Tandy's proffered expert testimony relates to the concept of "static stability factor" or T/2h, which is a widely accepted rollover measure adopted by, among others, the National Highway Traffic Safety Administration, in developing the star rating system. The engineering formula is Average Track Width (front and rear) divided by two times the center of gravity height. It is a measure that helps determine the ease of rollover of a particular design.



Mr. Tandy's opinion, as stated in his report, is as follows:

> Simply dividing the track width by the center of gravity height to compute a "static stability ratio" is not a reliable technique to measure dynamic stability for any vehicle, including the Ford Explorer. Such computation will not predict the vehicle's behavior, nor will it allow valid comparisons to decide what is "safe" and "unsafe".[3]

This statement or opinion should be excluded because it is not supported with scientifically valid data, test results, scientific protocol, or objective methodology, and thus should be excluded under Rules 401, 402, 403 and 702. *GE v. Joiner*, 522 U.S. 136, 146 (1997) (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) (stating that "an expert's

---

[3]     Exhibit 1: Report of Don Tandy.

*failure to explain the basis for an important inference mandates exclusion of his or her opinion*.").

The Eleventh Circuit has noted that "SSF is recognized by the NHTSA as a valid measure of rollover resistance. Higher SSFs are generally correlated with a lower likelihood of rollover. The SSF is equal to the track width of the vehicle divided by two times the vehicle's center of gravity height." *Ivy v. Ford Motor Co.*, 646 F.3d 769, 774 n.5 (11th Cir. 2011). Mr. Tandy's statement or opinion has no support in science, is not reliable and should be excluded.

## 2. **EXPERT ROGER BURNETT**

Ford has designated Roger Burnett to provide opinions about the safety belt used by Mr. Ammerson (the Decedent). One opinion Mr. Burnett provides is about the belt retractor's performance in a rollover mode. The opinion is set forth below:

> The seatbelt retractors used in the 2000 Ford Explorer front seats will lock the webbing from being pulled out during the early stages of a vehicle roll event and will stay locked until the vehicle is stationary, upright, and tension on the webbing is removed. A locked retractor will prevent webbing from being pulled out, but may pull webbing in if the opportunity exists. (Roger Burnett)

In summary, Mr. Burnett wishes to give the opinion that Mr. Ammerson's seat belt retractor will remain locked in a rollover once it locks. The witness provides no scientific support for the opinion and the opinion lacks any scientific basis. Mr. Burnett's opinion about safety belt retractor locking is not supported with

scientifically valid data, test results, scientific protocol, or objective methodology, and should be excluded under Rules 401, 402, 403 and 702. *GE v. Joiner*, 522 U.S. at 146 (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Hudgens*, 328 F.3d at 1344 (stating that "an expert's *failure to explain the basis for an important inference mandates exclusion of his or her opinion*.").

The designer and manufacturer of the safety belt retractor is TRW. In 1996, four years before the subject vehicle was manufactured, TRW advised Ford in writing that this conventional retractor would not remain locked in rollover accident. The TRW statement in its entirety is shown below:



1996 Letter from TRW to Ford

In conclusion, Mr. Burnett's testimony on this point is unreliable and inadmissible because the theory has no scientific support in testing; has no

supporting data, has not been subjected to peer review and publication; there is no

rate of error information provided; the testimony has no foundation in science; and

the testimony is inconsistent with the publications of the designer of the retractor,

TRW.

### 3. <u>FORD'S PROFFERED USE OF STATISTICS</u>

Ford proffers several expert opinions that rely on general statistical data from

the National Automotive Sampling System/Crashworthiness data ("NASS"). The

related expert testimony is designed to allow the witnesses to advocate that the

subject accident is violent and that it is more severe than 99% of all frontal impact

crashes. The three opinions that should be excluded are:

- Proffered expert Michelle Vogler claims that the NASS data indicates that SVRA (single vehicle rollover accidents) such as occurred here are "infrequent", and that the NASS studies she relies on indicate that the risk of a front seat occupant fatal or serious injury increases with the number of rolls experienced, and that the majority (93%) of front outboard occupants who experienced a rollover in passenger cars and light trucks in the database received either moderate or no injuries.[4]

- Proffered expert Roger Burnett was also proffered to discuss seat-integrated restraints (so-called "SIR" safety belts), which is a type of safety belt that is mounted to the seat rather than mounted to the structure of the vehicle. Mr. Burnett used NASS data to conclude that there is no difference in the rates of fatality, serious injury, or ejection when comparing occupants wearing SIR seatbelts to occupants wearing conventional seatbelts in rollover crashes.[5]

- Proffered expert Don Tandy claims that the same NASS data allows him to evaluate " the severity of this rollover" in terms of number of quarter turns

---

[4]   Exhibit 2: Report of Michelle Vogler.
[5]   Exhibit 3: Report for Roger Burnett.

and that he compared that to published data to conclude that "This vehicle (the Ammerson Explorer) overturned two and three quarter times which corresponds to eleven quarter rolls, and that according to this NASS data, the rollover crash in this case was more severe than 99% of all rollover crashes.[6]

The clear implication of the argument is Ford's desire to urge that this is generally a bad (violent) crash and bad things happen generally in bad crashes.

The Plaintiffs move to exclude the referenced testimony under Fed. R. Evid. 401, 402, 403 and 702(a), because it is derived from crashes that are not substantially similar to the subject accident. Under applicable law, expert testimony must be both relevant and helpful to the jury. Fed. R. Evid. 702(a). The Court's role is to "keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999). "Thus, the evidence must have a valid scientific connection to the disputed facts in the case." *Id.* at 1312 (citing *Daubert*, 509 U.S. at 591 ("[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . . Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."))

In *Anderson v. FCA United States, LLC*, CIVIL ACTION No. 5:16-CV-558 (MTT), at *12-14 (M.D. Ga. Feb. 21, 2019), the district court was faced with very

---

[6]     Exhibit 2: Report of Don Tandy.

similar issues when defendant FCA proffered expert testimony using virtually the same data from the NASS database tending to establish that front impacts with a delta-V, or change in velocity, of 30 mph or less account for more than 98% of all frontal impacts and that front impacts with a delta-V of 40 mph or less account for more than 99% of all frontal impacts." *Id*. at 3. The claimed expert desired to testify that the data demonstrate that the impact in that case was more severe than 99% of all frontal impact crashes. *Id*. As one would expect, the plaintiffs moved to exclude the testimony under Rules 401-403 and 702 of the Federal Rules of Evidence.

In excluding the evidence, the district court in *Anderson* noted as follows:

> "… as FCA acknowledged at the motion hearing, it simply wants to use the data to "put in perspective the impact." *Id*. at 29:13-19. In other words, FCA wants to show this was a bad crash, a point made abundantly clear by other evidence. *Id*. at 41:14-19. Although FCA argues that the data could be relevant to a risk utility analysis, it does not contend that the data were relevant to the design of the Jeep. *Id*. at 33:13-34:5. In other words, FCA does not argue that it did not design the vehicle to withstand crashes in the most dangerous one percentile. *Id*. at 41:14-19. The Court agrees that the NASS data *could* be relevant to a risk utility analysis, but Toomey does not use the data for that purpose. FCA just wants the jury to know in the abstract—and not in connection with any opinion rendered by Toomey—that this was a bad crash. *Id*. Lacking, at this point, any relevance to any legitimate issue, the Court agrees that Toomey's parroting of the statistical data should be excluded. Accordingly, the Plaintiffs' motion to

exclude Toomey's testimony regarding the NASS data (Doc. 44) is **GRANTED."**[7] (emphasis added)

In addition to the foregoing, the Vogler statistical opinions regarding the roof are not admissible for another reason. The studies Vogler relies on have not controlled for a whole host of specific accident variables, including size, make, model, speeds, steering, impacts, impact velocity, and orientation, which is consistent with her testimony that she made no effort to limit the analysis just to accidents that were substantially similar to the subject.[8] And the author of the study referenced by Vogler (Padmanaban) had this very source work excluded for, among other reasons, the failure to consider only similar accidents, including the host of variables referenced above. See, e.g., *Bavlsik v. Gen. Motors LLC*, No. 4:13 CV 509 DDN, at *6-11 (E.D. Mo. Aug. 18, 2015).

## 4.  EXPERT TESTIMONY ABOUT EFFECTIVENESS OF SEAT BELTS

Ford offers two expert witnesses – Ram Krishnaswami and William Van Arsdell – who both offer the general opinion that seatbelts are the most effective crashworthiness countermeasure to reduce fatalities in rollovers. The actual opinions mirror each other as follows:

- Ford offered a report from Ford employee Ram Krishnaswami, which included the opinion that "The primary restraint that provides occupant

---

[7]    *Anderson v. FCA United States, LLC*, CIVIL ACTION No. 5:16-CV-558 (MTT), at *12-14 (M.D. Ga. Feb. 21, 2019).

[8] Deposition of Michell Vogler, pp. 38:18-46:3.

protection in every Ford vehicle is the safety belt. Studies known to and relied on by Ford prove that properly worn safety belts provide substantial protection to occupants in rollover crashes. Data Link (1993) shows that 97.4% of belted occupants in rollover crashes survive without serious injury. In a follow up study limited to SUVs, Data Link II (1999) shows that 98.6% of belted occupants in rollover crashes survive without serious injury."

- Ford offered a report from William Van Arsdell that stated: "Seat belts that comply with the FMVSSs have been shown to be highly effective in reducing the risk of serious injury in reasonably foreseeable collisions."

There is no dispute that the Decedent (Ronnie Ammerson) was wearing his available safety belt. These opinions imply that a seat belt was not worn, or not worn properly, and therefore the Decedent was not using the best form of protection against crash injuries, which is simply not true. These opinions are general statements that have no relationship to the facts of this case, are misleading, and not appropriate. This type of general opinion testimony has been excluded in the past by courts as inappropriate expert testimony and should be excluded here. *Bavlsik v. Gen. Motors LLC*, No. 4:13 CV 509 DDN, at *12 (E.D. Mo. Aug. 18, 2015) (Ms. Padmanaban's first opinion that, "safety belts are the most effective crashworthiness countermeasure to reduce fatalities in rollovers" (Doc. 66-5 at 5), has no relationship to the facts of this case. Both sides admit that Dr. Bavlsik was wearing a seat belt. This opinion implies that a seat belt was not worn by plaintiff and therefore he was not using the best form of protection against crash injuries, which is simply not true. The court concludes this opinion is irrelevant and, therefore, not admissible).

### 5. <u>EXPERT TESTIMONY RELYING ON INVERTED DROP TESTING</u>

Ford has proffered expert opinions (Burnett, Vogler, Krishnaswami, and Van Arsdell) that rely on certain testing referred to as inverted drop testing. Although drop testing in general is considered valid and reliable for purposes of supporting certain opinions under certain circumstances[9], Ford's four experts (and possibly more of them) are relying on the referenced drop testing for reasons that fail the criteria required under Rule 702 for admissibility, including (a) using a methodology (drop height, roll angle, and pitch angle) that has no scientific basis and bears no

---

[9]      Courts have previously concluded that inverted drop testing is a commonly and generally-accepted method of testing roof strength, and testimony based on inverted drop tests has consistently been admitted by courts within and without the Eleventh Circuit because the testing was not offered to purport to re-create events of a particular collision at issue, but simply to demonstrate the contact forces at play during an accident. *See, e.g., Crossley v. General Motors Corp.*, 33 F.3d 818, 822 (7th Cir. 1994) ("Demonstrations of experiments used merely to illustrate the principals forming an expert opinion do not require strict adherence to the facts, and courts may admit such demonstrations so long as they are offered to illustrate scientific principals rather than as re-enactments.") (internal citations and quotation marks omitted); *Fox v. General Motors LLC*, No. 1:17-cv-209-MHC, 2019 WL 3483171, at *6-8 (N.D. Ga. Feb. 4, 2019) (allowing expert Brian Herbst to testify using inverted drop tests); *Ruark v. BMW of North America, LLC*, No. ELH-09-2738, 2014 WL 351640, at *9 (D. Md. Jan. 30, 2014) (holding that "inverted drop tests are a scientifically valid method for analyzing roof performance in rollover crashes, even though they do not replicate the precise circumstances of a rollover crash"); *Milne v. Volkswagen AG*, No. 2:05-cv-323, 2009 WL 10702722, at *1 (D. Vt. Jan. 22, 2009); *Whitten v. Michelin Americas Research & Development Corp.*, No. 05-2761-JPM/TMP, 2008 WL 2943391, at *5-7 (W.D. Tenn. July 25, 2008) (allowing inverted drop testing evidence because it does not purport to recreate the accident) (citing *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006) ("When the demonstrative evidence is offered only as an illustration of general scientific principles, not as a reenactment of disputed events, it need not pass the substantial similarity test."); *Cabassa-Rivera v. Mitsubishi Motors Corp.*, No. 05-1217(JAF), WL 6870560, at *4-6 (D. P.R. May 2, 2006).

relationship to the forces involved in the subject crash, but are instead intentionally designed to produce a particular result; namely, to get the dummy's head to the closest and hardest surface with the highest possible energy; and (b) uses ATDs (test dummies) that lack appropriate biofidelity in rollovers and thus is misleading because they are not representative of what would occur in an actual accident, nor do the test dummies move like humans in a scientifically valid manner so that conclusions attempted to be drawn have any scientific validity or basis. The evidence therefore violates Rules 401, 402, 403 and 702.

The problematic drop tests in the instant case are different than normal drop tests. Here, the opinions that fail the Rule 702 test include:

- "A series of inverted vehicle drop tests have been conducted with fully instrumented crash test dummies. These tests allow a direct comparison between injury risk with conventional roof structures and vehicles with reinforced or rigidized roof structures. These tests demonstrate that the risk of injury in this type of impact is not caused by roof deformation and reducing or eliminating this deformation does not reduce the risk of injury. This series includes testing of the 2000 Ford Explorer of the same design as the case vehicle."[10]

- "Inverted drop tests were also conducted on two 2000 model year Ford Explorer vehicles, one with a production roof structure and one with a roll-cage reinforced roof (Figure 5). These tests incorporated a belted instrumented test dummy in the front passenger's seat and consisted of dropping the inverted vehicle from a height of 18 inches with an approximate initial roll angle of 10 degrees and a nominal 1 degree pitch. The instrumented dummy test data indicate that vehicle occupants can experience comparable injurious loading conditions in both production vehicles and vehicles with reinforced roofs. Furthermore, the tests demonstrate that the presence of injurious

---

[10]     Exhibit 3: Report of Roger Burnett.

loading conditions occur early in the roof deformation sequence and well before any extensive deformation develops, which is consistent with the findings of other demonstrative rollover testing conducted with instrumented dummies."[11]

- "The Ford Explorer's body structure, along with the available restraint system, do play an important part in rollover crash safety; however, increasing the strength to weight ratio (SWR) of the Explorer beyond its existing design to address roof deformation will not prevent injuries in rollover crashes. This is based upon decades-old research and has also been demonstrated in instrumented ATD drop tests. Drop tests performed in this matter confirms this scientific principle. Plaintiff experts' claims that limiting roof deformation will prevent injuries in rollovers is incorrect and not scientifically supportable."[12]

- "If properly worn, the subject seat belt system would have provided good fit for Mr. Ammerson, he could still make head contact with the headliner near the roof rail with other restraint designs, including (1) a cinching latch plate, (2) a pretensioner, and (3) a seat with a seat-integrated seat belt. Bases: a. Inversion work conducted December 2021.[13]

In short, Ford seeks to use this testing to do the following: (a) argue that the risk of injury to this plaintiff (Mr. Ammerson) was not caused by roof deformation; (b) imply that Mr. Ammerson, like the test dummy, could have experienced similar injuries from loading regardless of roof deformation; (c) imply that Mr. Ammerson's loading would have occurred early rather than late in the loading; and (d) that Mr. Ammerson, even belted, would make head contact with the roof. The problem of course is that all of these arguments ignore the fact that the referenced testing does

---

[11]    Exhibit 2: Report of Michelle Vogler.
[12]    Exhibit 4: Report of Ram Krishnaswami.
[13]    Exhibit 5: Report of William Van Arsdell.

Case 2:18-cv-00189-RWS   Document 115   Filed 03/16/22   Page 18 of 21

not replicate the conditions of Mr. Ammerson's accident; are not even attempts to
replicate the conditions present in this accident; include conditions that were not
present in Mr. Ammerson's accident; and use non-biofidelic test dummies that are
not scientifically valid for replicating human motion or injurious loading. The
methodology is non-scientific for these reasons.

First, the test conditions created by Ford's witnesses – namely the drop height,
roll angle and pitch angle – all bear no relation to this accident or the appropriate test
protocols for conducting drop testing. Why? Because the conditions were chosen to
intentionally produce a particular result: namely, to get the test dummy's head to the
closest and hardest surface with the highest possible amount of energy. The drop
conditions are not intended to match any part of any particular accident, especially
Mr. Ammerson's, but to produce the desired result, namely a high neck load.

Second, the roof crush (deformation) in the production test resulted from
being dropped from 18", which produces damage that is totally inconsistent with the
damage in Mr. Ammereson's vehicle, which means that the test applies much more
force to the roof than in the subject accident. That means that the loads into the
production vehicle are not representative of what would have or did happen in Mr.
Ammerson's accident. Consequently, the testing is not relevant to the facts of the
case. *Allison*, 184 F.3d at 1312 (stating that "the evidence must have a valid scientific
connection to the disputed facts in the case."); *Daubert,* 509 U.S. at 591 (holding

Cosper v. Ford
2:08-CV-00189
                                  18

scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility").

Third, the ATD or test dummy Ford chose for this testing lacks biofidelity in rollovers and thus the conclusions Ford's experts seek to draw and make regarding injury potential have no scientific validity or basis. It is inappropriate science to attempt to use these test dummies to evaluate injury potential of Mr. Ammerson in this accident. *See GE v. Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Here, there is *no* data or other basis on which to conclude that the test dummies are representative of potential injuries to Mr. Ammerson in the accident. Lastly, the inverted drop tests Ford now relies on clearly were not designed to re-create Mr. Ammerson's accident in terms of forces involved. Likewise, the test dummies are incapable of moving like Mr. Ammerson did in the accident. As a consequence, the tests cannot be used to draw conclusions about Mr. Ammerson's occupant kinematics, injury mechanism or injury level of the actual people in the accident or even how a dummy might move in this accident. Yet, that is precisely what Ford desires to say and argue. The testing is not supported with scientifically valid data, test results, scientific protocol, or objective methodology, and should be excluded under Rules 401, 402, 403 and 702. *See GE v. Joiner*, 522 U.S. at 146

One final point needs to be made regarding Dr. Vogler because she emphasizes several times in her testimony that one of Mr. Ammerson's experts, Mr. Herebst, has in the past performed drop tests using test dummies. That statement is absolutely true. However, what Dr. Vogler very conveniently fails to point out is that Mr. Herbst's testing using test dummies had a very different intent in that each of those tests was an experiment into the general effect of particular variable changes, not to predict injury outcome or compare the result to a performance in an accident as attempted here. Such use – or attempted use – has no scientific validity.

**E.    CONCLUSION**

For the reasons stated, the Plaintiff requests that her motions be granted.


Dated this 16th day of March, 2022.

RESPECTFULLY SUBMITTED,


/s/C. Tab Turner
C. Tab Turner
Turner & Associates, P.A.
4705 Somers Avenue
Suite 100
North Little Rock, Arkansas
501-791-2277
tab@tturner.com

*/s/ Matthew E. Cook*
Matthew E. Cook
Georgia Bar No. 184399
Kate S. Cook

Georgia Bar No. 280584
Robert H. Childres III
Georgia Bar No. 721558
P.O. Box 2415
Gainesville, GA  30503
678-928-3899 Telephone
888-612-0589 Facsimile
matt@cook-lawgroup.com
kate@cook-lawgroup.com
robert@cook-lawgroup.com

/s/Jonathan A. Parrish
Jonathan A. Parrish
Georgia Bar No. 263008

The Parrish Law Firm, LLC
Resurgens Plaza, Suite 2250
945 East Paces Ferry Road, NE
Atlanta, GA 30326
jparrish@parrishfirm.com
Tel: 404-891-0141
Fax: 404-891-0143

## CERTIFICATE OF SERVICE

I certify that this pleading has been served on all counsel of record on this 16th day of March, 2022 via electronic means.

/s/ Tab Turner
TAB TURNER
Counsel for Plaintiffs